OTTO HEINK, APPELLEE, V. THEODORE F. LEWIS, APPELLANT.

FILED JUNE 26, 1911. No. 16,501.

Evidence examined and set out in the opinion *held* insufficient to sustain the verdict of the jury.

APPEAL from the district court for Douglas county: GEORGE A. DAY, JUDGE. *Reversed.*

*Martin Langdon* and *Howard B. Smith,* for appellant.

*Charles W. Haller, contra.*

FAWCETT, J.

Plaintiff alleges that on or about February 17, 1906, he made an oral agreement with defendant that plaintiff should take charge of a certain brewery at Crete, Nebraska, and perform the duties of superintendent, manager, and brewmaster, and receive from defendant $75 a month therefor, which amount defendant agreed to pay; that he duly performed his part of the agreement and worked steadily from said date until January 1, 1907, when it was orally agreed between plaintiff and defendant that plaintiff should receive from defendant for said services $125 a month, which defendant agreed to pay, and that plaintiff fulfilled his part of said new agreement

48

until June 17, 1907; that defendant paid to plaintiff on account of the foregoing $75, $35 and $10; that during the year 1906 plaintiff at the oral request of defendant furnished money in the payment of help at said brewery and at a new one then building, and to pay for materials, in the sum of $750, no part of which has been paid. The answer denies all of the allegations of plaintiff's petition, and alleges "that the Western Brewing Association, the brewery referred to in plaintiff's petition, is a corporation duly organized according to the laws of the state of Nebraska, and located at Crete, Saline county, Nebraska;" that said association leased the old brewery from the estate of one Kobes; that plaintiff was chief promoter of said brewing association and became its president and was a stockholder and director of said brewing association; and that "(9) this defendant further states that he was not the owner of said brewery, and that he had no interest in the same, except as a stockholder; that he was not authorized by said association, nor did he have any authority, directly or indirectly, to hire any party or parties, as superintendent, brewmaster or otherwise, to work for said brewing association." The reply denies paragraph 9 of the answer, and denies that plaintiff was the chief promotor of said association. The jury returned a verdict for plaintiff for $500, upon which judgment was entered, and defendant appeals.

· Some minor questions are discussed in briefs of counsel, but, having reached the conclusion that the judgment must be reversed for the reason that it is not sustained by the evidence, such other questions need not be considered.

The record shows that on June 1, 1905, plaintiff, Otto Heink, together with P. A. Gavin and A. L. Knabe, organized and incorporated the Western Brewing Association of Crete, Nebraska. The articles of incorporation provided that its capital stock should be $100,000, to be divided into shares of $10 each; "said capital stock when subscribed for and issued shall be fully paid and non-

assessable." Of this capital stock 1,700 shares were is-
sued to Mr. Heink, who was made president of the asso-
ciation, and 1,700 shares to Mr. Gavin, who was made
secretary and treasurer. Just how much was issued to
Mr. Knabe, who was made vice-president, is not shown.
Neither Heink nor Gavin paid anything for their stock.
Subsequently Knabe was substituted as treasurer, and
Gavin became vice-president, in addition to his secretary-
ship. All three became directors, and, so far as the record
shows, continued as such unless Mr. Lewis, when he later
became a member of the association, succeeded Mr. Knabe
in that capacity. The evidence upon this point is not very
clear. It is clear, however, that Heink and Gavin were
directors from start to finish. The original incorporators
having paid nothing for their stock, there was no money
in the treasury, so that it was a corporation on paper, but
without funds. Mr. Knabe was a friend of defendant
Lewis, and occupied the same office with him in the New
York Life Building in Omaha. At the beginning of their
business career Mr. Knabe and Mr. Gavin, who seemed
also to have been acquainted with defendant, borrowed
money from him from time to time. Among other sums
they borrowed $2,500 with which to furnish a site for a
brewery, and gave him therefor the association's note. In-
stead of building a brewery, they finally decided to lease
the Kobes brewery at Crete, after which they entered upon
the brewery business and also conducted a saloon in that
city. After they had been borrowing for some time, Heink
asked Mr. Knabe from whom they were borrowing money,
and finally about July 1, 1906, Heink was introduced to
Mr. Lewis by Knabe. Mr. Knabe testifies to this posi-
tively, and says that Heink had never met Lewis prior to
the time of this introduction. Shortly thereafter, the
exact date not being shown, defendant was induced to
purchase a block of the association's stock, for which he
paid into the association $5,000 in cash. The brewery
burned in June, 1907, and the books of the association
were burned in that fire. Plaintiff does not testify as to

the proceeds of sales of beer. Gavin, who, according to the testimony of plaintiff, was to receive $100 a month as business manager, was unable to state the amount of such sales. Knabe testified that as treasurer he went over the books with the plaintiff, and that the books as made up by plaintiff showed that plaintiff had received from sales of beer about $6,900. This, with the $5,000 cash paid in by defendant for his stock, made $11,900. This was not sufficient, however, to keep things going, so the association borrowed $6,000 more from defendant, making $11,000 in all that defendant paid into the treasury of this association. Plaintiff testified that between July, 1905, and February 17, 1906, he and Gavin and defendant met on numerous occasions in Omaha and Crete "and talked and planned about engaging in the brewery business at Crete." According to his statement, these interviews began a month after the corporation had been formed, and ended nearly five months before Knabe says Heink and Lewis had ever met. Plaintiff further testified that on or about February 17, 1906, the three met again in the office of the association in Crete, and that it was there mentioned that the income from the business would not be sufficient to pay plaintiff and Gavin, and that they both stated that they would have to have money for their services, or "we could not live;" that defendant then said, " 'Of course, you two men have families to support, and I will pay your salaries out of my own pocket.' He, Lewis, at that time, agreed to pay me out of his own means $75 a month for my services as superintendent and brewmaster of the business, and to pay Patrick Gavin $100 a month for his services as manager of the business. Under this promise of Lewis I went to work." If the testimony of Knabe be true, then plaintiff commenced to work 4½ months before he had ever met defendant. Plaintiff says that he continued to work under that agreement until January 1, 1907, when he told Lewis that he had an offer of $125 a month from a brewery at Wilber; that unless his salary was raised he would quit and

go there; that Lewis then agreed to pay him $125 a month for his services, and that under this oral agreement he worked steadily from January 1, 1907, to June 17, 1907. He testifies that the only money he ever received from Lewis was $75, $35 and $10, or a total of $120, covering a period of time when, according to his testimony, he would have earned from Lewis nearly $1,500.

Keeping in mind the declaration which he said he made to defendant that he would have to have money for his services or he could not live, we are next met with the remarkable testimony by plaintiff that defendant told him in January, 1906, which was before the company had commenced to do business, that if he, plaintiff, would advance moneys for work, labor, material, and expenses in the business and construction work, as the payments came due, defendant would personally pay back all the money he had so advanced, and that, pursuant to that agreement, he advanced from time to time in 1906 and 1907 $750. The first time, according to his testimony, that he made any demand upon Lewis to pay him the salary which had been accruing was in December, 1906, at which time he says defendant told him that when he sold his Dakota and Kansas land "he would pay me, and pay me everything back." He further testifies that on January 10, 1907, defendant showed him all the papers in his proposed land deal in Dakota and Kansas; that these papers were already made out to transfer the property; that defendant then told him that when he got the money from these lands he would pay him. He testifies: "I told him that I would not wait any longer, and went out. He came and called me back into the office, and told me if I would stay he would pay me, and also pay me extra for the trouble I had been put to." He also testifies that Knabe and Gavin were there at the time. Knabe flatly denies any such conversation. Weber, a man who worked at one time for the association, testified to having two interviews with Lewis in Omaha in March or April, 1907. He says: "I telephoned Lewis, and he said he was ready to close the land deal and he was to come down and

pay us off;" that by "us" and "we" he meant Heink and himself. He further testified that the work he did was for the association; that the association paid for part of his services, and Lewis promised to pay the rest of it, if he stayed; that President Heink paid part of his services; and on redirect he was asked, "Do you know from whom all the money came," to which he answered, "Most money came from the bar and saloon up in town." Gavin testified that he was present when Lewis and Heink talked about Heink's salary as brewmaster about April, 1906, and in January, 1907; and that "Mr. Lewis told Mr. Heink that he would pay his wages and not wait for results, or returns. Q. Can you give the exact language? A. That is all I can. I can only say what Lewis said, that he would pay his wages, $75 a month, and that was very distinct." He fixed the date of the second conversation as very early in January, 1907, at which time he says Heink came down to Omaha and wanted his wages; that the interview was in Mr. Lewis' office; that Mr. Lewis answered him "and said he did not have the money just yet, that he had papers made up;" that he said, "I will pay you as soon as I sell this land of which I got the papers ready," and that he showed them the papers. He also testifies that at the time Heink was talking about leaving Mr. Lewis said, "Mr. Heink, I cannot afford to have you leave me now at any price, and I will give you $125 if you will stay, because it will ruin me if you should quit now;" that that conversation was in the early part of January, 1907. He also testifies that neither he nor Heink got any salary from the brewing association; that they paid out the money they took in for help and material, and did not retain anything for themselves.

For the defense, defendant himself denied ever having in any manner agreed to pay the salaries of Heink or Gavin out of his personal funds. He admits that he was present at some of the times testified to by Gavin, but positively states that he made no promises to pay personally any of those accounts; that he subscribed

$5,000 for stock and paid the same in full, and that he paid that money to the association; that during all of the time Heink was in the absolute control of the brewing association at Crete; that there was a saloon connected with the brewing association; that he never collected any of the money that came into that saloon; that he borrowed money on his farm in South Dakota to the amount of $4,000 and turned that over to the association; that the whole amount he turned in would reach the sum of $11,000, $5,000 of which was for stock and the other $6,000 a loan; that the talk between himself and Heink and Gavin was that they should receive their salaries from the income of the brewing association at Crete. "Q. What did they say to you about getting their salaries from the brewing association? A. I was furnishing money to the brewing association. I was trying to raise some money. I told them as soon as that money was raised I would pay it into the association and they could be paid. That was all there was to it. That is the whole conversation that occurred between us." These statements by Mr. Lewis are fully corroborated by Mr. Knabe, who also testified that Heink never at any time intimated to him that Lewis was to pay his salary; that at the time Heink had the proposition from the brewery at Wilber they talked the matter over, and Heink said he had been offered a salary of $125 a month, "and he said in the same conversation that he did not like to accept that salary, inasmuch as he had been connected with this brewing association, and had been one of it, and I told him that I did not think it would be right for him to do that, and he said he did not think so either. So he said, however, that instead of accepting that salary which they had offered at Wilber, if the brewery at Crete could pay him $75 a month he could get along, and he would get along and continue as brewmaster;" that at that time witness was vice-president. He says further: "I told him that, if it was satisfactory to him, to accept the $75 a month, that I thought that the brewing company would pay him

that amount, and that I would at once send him his half-month's salary, which I did. I sent that to him myself."
He then testified that he purchased a draft at the United
States National Bank for $37.50 for the half-month's salary and sent it to plaintiff; that in two weeks from that
time he sent him another draft from the same bank for a
like sum. He also testifies that the $75 and $35 and $10
which plaintiff claims to have received from Lewis were
sent to plaintiff by the witness, the $75 in the two drafts
above noted; that he gave him $35 in cash at another
time, and sent him a check for $10, which check was introduced in evidence, and that this money was sent to
him on the part of the Western Brewing Association;
that Heink had charge of the brewery and collected all of
the moneys, with one or two exceptions, when Mr. Gavin
made the collections and deposited the same in the bank;
that the $750 deposited in the bank by Heink was money
which Heink had collected from the sale of beer, and that
Heink never at any time told him that he had advanced
$750 of his own money for the benefit of the association;
that he had a number of conversations with plaintiff about
his salary, and that plaintiff at all times expressed himself as satisfied with the arrangement. He testifies: "He
was still satisfied that the business was going along all
right, and in the end it would be a profitable business for
him and for all of us.   *   *   *   He never mentioned
anything to me that he was dissatisfied.   *   *   *   He
was not so much interested in the salary as he was in the
business, that the business would be a success, that the
brewing company would be a success. He was not so much
interested in the salary.   *   *   *   Q. Did he in any of
those conversations make any claim that Mr. Lewis should
pay his salary, or at any other time? A. No, sir; never.
Q. But it was to come from the brewing association? A.
Certainly;" that plaintiff worked for the association until
May or June, 1907. "Q. And that was, as you testified,
$75 a month? A. Yes; that is the arrangement we had.
He talked to me about it and said he had to have some-

thing to live on, and I told him I thought that the company might be able to spare that much out of the business, and afterwards I talked with Mr. Gavin about it. It seemed to be agreeable to everybody, to both Mr. Gavin and I." The witness was then shown two papers purporting to be copies of the minutes of two meetings of the company, one dated July 10, 1905, and the other November 18, 1905, each of which recited that the directors present were "P. A. Gavin, Otto Heink, T. F. Lewis." He was asked if they were in his handwriting. He answered that they were, but testified that Lewis was not present at those meetings; that those copies were drawn at the request of Mr. Gavin, who stated that he wanted to use them in connection with a case at Wilber where the brewing company had a suit, and that he made them as suggested by Gavin; that Gavin dictated the form; that they were not correct copies of the minutes so far as Lewis was concerned, as "he was not there;" that he did not copy them from any book or from any writing of any kind, but prepared them in the form desired by Mr. Gavin. These papers were received and read in evidence. Mr. Lewis was recalled and testified that he was not a director at any time during 1905, that he was not present at either of the meetings referred to in the two exhibits, and that he never at any time paid any money to plaintiff on his salary as brewmaster of the association. Mr. Gavin, being recalled by plaintiff, testified that the two exhibits referred to were prepared to show in court at Wilber that the corporation was in existence; that they were made from a copy of the minute book; that the testimony of Mr. Knabe that he, Gavin, suggested the contents of the exhibits was not true; that Knabe got the contents of exhibits 4 and 5 from the minute book of the association; that Mr. Lewis was present at the two meetings of July 10, 1905, and November 18, 1905; that the others present were Heink and himself; that Lewis was always in the company from the very start.

The above, in substance, is the testimony given upon the trial, and it is now insisted by plaintiff that this tes-

timony was conflicting, that there is ample testimony for the plaintiff to sustain the verdict, and that this court cannot disturb the same. So far as the oral testimony of the witnesses for the respective sides is concerned, this contention is sound, and, if the case had to stand upon this testimony alone, the judgment of the district court would have to be affirmed; but there are facts and circumstances established by the evidence given by plaintiff and his witnesses which thoroughly impeach their testimony, viz.: (1) Plaintiff who, as a foundation for his claim, testified that he told defendant that he would have to have a salary or he could not live, according to his own testimony continued to work from February 17, 1906, to June 17, 1907, until he had earned nearly $1,500 in salary, and during all that time received from defendant only $120. (2) Without any money to pay for his stock, and without any money to live upon while performing the services as brewmaster, he claims to have advanced $750 in cash for the association. (3) That defendant, after paying the $5,000 in cash for stock, and after having loaned the association $6,000 in money in addition thereto, agreed to pay out of his own private funds the salary of the two highest priced officials in the association. This testimony is so incredible and so contrary to every human probability as to carry with it its own refutation. It is beyond belief that any man of sufficient business ability and sagacity to accumulate an estate which would enable him to advance $11,000 to this association would in addition thereto enter into so improvident and absurd an arrangement; and this, too, in the face of the fact that he must have known that, as testified by Mr. Gavin, the association was then taking in about $400 a month for the sale of beer. The injustice of this claim is too patent to be overlooked by this court. The testimony of the witnesses, when considered in the light of the facts and circumstances disclosed in the record before us, satisfies us that plaintiff and Gavin and Knabe organized this brewing association purely upon "high finance" lines. They organized it without money, first borrowed

money from defendant, then induced him to become a member, obtained all the money possible from him, amounting to $11,000, collected all the money from the sale of beer, amounting to nearly $7,000 more, and now, after the brewery has been destroyed by fire and their high finance bubble thereby exploded, they seek to fasten upon defendant compensation, under the guise of wages, for the period of time when they were conducting the affairs of this association, which, as testified by Mr. Knabe, at that time had "nothing except prospects." We think the facts and circumstances above outlined, together with the testimony of defendant and of the witness Knabe, when viewed in the light of reason and common sense, completely outweigh the testimony given in support of plaintiff's claim, and that Mr. Lewis stated the whole case in a nutshell when he testified, "I was furnishing money to the brewing association. I was trying to raise some money. I told them as soon as that money was raised I would pay it into the association and they could be paid. That was all there was to it. That is the whole conversation that occurred between us." Moreover, it is incredible that plaintiff, who, according to the uncontradicted testimony, had sole charge of the business at Crete and collected nearly $7,000 from the sales of beer, would, in his impoverished condition, go from February 17, 1906, to June 17, 1907, without using any portion of the moneys received from such sales, as his own compensation, when all that he had received from both defendant and Knabe during all that time was the pittance of $120. We are satisfied that the jury never took into account the strong corroboration of defendant's testimony by the facts and circumstances above outlined. Had it done so, it seems clear to us that they never would have arrived at the verdict returned in this case. Even though the oral testimony in a case be sufficient to sustain the verdict of the jury or a finding by the court, when such verdict or finding is so at war with common experience and surrounding circumstances as to render it unworthy of belief, an appellate court is not bound by such

verdict or finding, and will not hesitate to reverse the same. *Richardson v. Richardson*, 45 Ill. App. 362.

This court is ever loath to interfere with the verdict of a jury which is based upon competent evidence and has received the approval of the district court; but, where an examination of the oral testimony presented, and of the undisputed facts and circumstances surrounding the transactions testified to, satisfies us that such verdict is unjust, and that the jury must have arrived at their verdict by considering the oral testimony alone, to the exclusion of such facts and circumstances, it is our duty to interfere and grant a new trial.

The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.