ALBERT C. ATWATER, APPELLEE, V. CLARA M. SELLERS ET AL., APPELLANTS.

FILED DECEMBER 16, 1931. NO. 27891.

*Charles E. Bruckman,* for appellants.

*Bernard McNeny, James F. Crowley, James S. Gilham* and *L. A. Sprague, contra.*

Heard before ROSE, GOOD and DAY, JJ., and MESSMORE and NISLEY, District Judges.

MESSMORE, District Judge.

This is an action brought by appellee in the district court for Adams county to recover from appellants the sum of $5,000, together with interest thereon, for services alleged to have been rendered under an oral contract. A verdict was returned by the jury in favor of appellee for $6,040. Motion for a new trial was filed and overruled and judgment entered in favor of appellee in the sum of $6,040.

Appellee's petition sets forth that on or about May 10, 1927, William C. McCartney, an unmarried man, possessed of an estate of $125,000, and an uncle of appellants, was lying sick in a hospital in Hastings, Nebraska, without any hope or prospect of recovery from his illness; that previous to his coming to the hospital he had made a will devising and bequeathing his property to the Methodist Hospital in Omaha, Nebraska; that appellee, by inquiry, learned of the existence of appellants and their relationship to said McCartney and by writing to them procured their attendance upon the said McCartney; that thereupon the said McCartney made a second and last will devising and bequeathing his property to appellants; that the said McCartney died May 30, 1927; that appellants were strangers in the state of Nebraska, totally unacquainted with the laws and procedure of its courts or with the practicing attorneys therein and felt themselves helpless to assert their rights under the last will of said deceased; that appellants knew no one except appellee, and they made an arrangement with him that if he, appellee, would assist them in the employment of proper counsel, in the preparation of the necessary evidence for the maintenance of their rights in the courts, and in all respects advise and consult with them as to the assertion of their interests

under said will, they would, in the event of success in securing the property devised by said will, or the major part thereof, pay to appellee the sum of $5,000; that appellee performed his part of said agreement; that said will was duly presented to the county court of Adams county and admitted to probate; that the beneficiary under the first will thereafter appealed to the district court for Adams county and, pending the appeal, the controversy was settled. in October, 1927, by giving the beneficiary under the first will $7,200, and the title and rights of appellants in and to all the rest of the estate of the said McCartney were settled in appellants, amounting to upwards of $117,000.

To the petition two answers were filed. The answer of appellant Clara M. Sellers admits the relationship of William C. McCartney to her, his residence, his death; that he was treated for his illness, and possessed of real and personal property in Adams county and elsewhere in excess of the value of $100,000; admits that during the last illness of the said McCartney and while he was confined to the hospital and on or about the 10th day of May, 1927, he made and executed his last will and testament, giving and devising all his property to these appellants, his sole and only heirs at law and next of kin, in equal shares to them and their heirs forever; admits the filing of the petition for the probate of said will in the county court of Adams county, the filing of objections to the probate thereof by the Methodist Episcopal Hospital and Deaconess Home of Omaha; that said will was sustained in said county court and the objections of contestant to the probate thereof overruled, from which ruling and judgment said contestant appealed to the district court for said county; that in the course of the trial on the contest in said district court a settlement was made with contestant, giving it the sum of $6,750; denies all allegations contained in appellee's petition not admitted.

The joint answer of Irene M. Henderson and Harold G. McCartney to the petition of appellee is substantially the same as the answer of the said Clara M. Sellers.

The evidence discloses that appellee was a trained nurse, had lived in Hastings about 18 years, first met William C. McCartney, a man 75 or 76 years of age, who formerly lived in Roseland, Nebraska, when he went to the hospital to nurse him on April 25, 1927, and did nurse him for 5 weeks and up to the date of his death May 30, 1927; that appellee first met appellant Sellers on the 6th of May, 1927, when she came to the hospital where appellee was on duty; that the said William C. McCartney made a will which was drawn by Mr. Whalen, an attorney, and which appellee took and filed with the judge of the county court of Adams county and which was duly filed for probate in said court later; that the Methodist Episcopal Hospital and Deaconess Home filed objections to the probate of said will, which objections were overruled, and contestant appealed to the district court for Adams county.

The oral contract alleged to have been made with Mrs. Sellers was, as shown by the evidence, quoting from the testimony of appellee: "Q. What, if any, agreement did you make with Mrs. Sellers with reference to the contest of the will and the McCartney estate? A. She agreed if I would stay with them and help them and do all I could in helping them establish their claim to the estate that she would pay me $5,000. Q. What were you to do? A. No particular definite thing was mentioned, only I was to use my influence and do what I could in establishing sentiment in their favor in the community."

This alleged agreement was made after the will was offered for probate in the county court and was in a conversation had with Mrs. Sellers about the middle of July, 1927. Continuing: "Q. What else, if anything, was said about what you were to do? A. That was about the substance of it. If I helped them out and they were successful in getting the property they would pay me that amount. Q. What did you do under that agreement you had with Mrs. Sellers? A. I talked with a great many around Hastings and I talked with ones at Roseland and I tried to leave a good impression about these heirs, Mrs. Sellers,

Mr. McCartney and Mrs. Henderson. * * * Q. What did you do about looking up McCartney's record as to his mental capacity after this contest was started? A. I gave my testimony in court."

Witness testified he talked to different ones, a Mr. Hall and his son Leland Hall, to Mr. Mangus, Senator Vance, and Dr. Uridil, the attending physician of William C. McCartney. The evidence developed that the Messrs. Hall were bankers in Roseland, Mr. Vance was a state senator; that he consulted with the attorneys representing appellants after the case was taken to the district court on appeal from the action of the county court in admitting the will to probate; that he talked with the attorneys about the arrangement he made with Mrs. Sellers and talked to Irene M. Henderson and Harold G. McCartney in Mr. Bruckman's office in October when they came from the east. To the question, "State what Irene Henderson and Harold McCartney said to you about the contract, if they said anything," he replied, "The only thing they said was that they were going to make it right with me if I would stand by them. I wouldn't be certain of the exact words." Witness testified that he did everything that the attorneys requested him to do in behalf of appellants.

In corroboration of this agreement appellee offered the testimony of his wife, who testified that the oral agreement was alleged to have been made in the presence of appellee's wife and daughter. Her pertinent testimony on this point is as follows: "Q. Where were you when you had this conversation with Mrs. Sellers? A. One time we were out riding with them in their car. Q. What, if anything, did Mrs. Sellers say to you at that time about a contract or deal she had with your husband? A. We were talking about plans for the future and it came up about the mortgage on our place and she said she would give us the money to pay it. And Mr. Atwater said, 'Does your brother and sister stand back of you in this?' And she said, 'Yes, they do. But in case they shouldn't, I will take it out of my own pocket. I can afford to, can't I?' That she would pay

it out of her own pocket." On cross-examination she was asked the following: "Q. What was Mr. Atwater to do? A. Assist her. Q. What did she want him to do? A. I don't remember. Q. Testify as a witness? A. Yes, sir. Q. Testify as a witness because he had witnessed the will? A. Yes, sir."

The testimony of Mr. Whalen, an attorney, was offered, but a part of it pertaining to the alleged contract was taken from the jury as a privileged communication between attorney and client.

The testimony of L. J. Mangus, pertinent to the alleged contract, was as follows: "Q. After this contest was started on the will, did you have a talk with Mrs. Sellers about any arrangement she made with Mr. Atwater? A. Yes, sir. Q. What was said by her in that conversation? A. Well, she told me she was going to pay the mortgage for Atwater's home for what he had done for them. Q. Did she say what Atwater had done or was going to do for them? A. No; she didn't."

The evidence further discloses that at the time of the contest in the district court over the will it was desirable to have appellee as a witness in that matter; that about that time a letter was written, known as exhibit 1, by appellee to Mr. Bruckman, one of the attorneys for proponents of the will, the substance of which was that he desired to have a car sent for him and arrangements made so that he could leave the case that he was then nursing at Fullerton, and to receive a summons to appear. He further stated in the letter that he received a message from Hastings to the effect that there was more in it for him to stay away from Hastings and that he did not have to come unless he wanted to.

Appellee filed a claim in the county court of Adams county against the estate of William C. McCartney in the sum of $105 on which he was allowed $71, $7 a day for 7 days, 6 days' time and board lost in making two trips from Fullerton to Hastings, also one day testifying to prove will, total $49, which was allowed him, also $14 mileage and also

$7 mileage for another trip to Fullerton and return and a telephone call of $1.50, and he also received an additional $8.10 for testifying in the district court. Said claim was filed October 31, 1927, and paid. The case in the district court was disposed of on the 24th day of October, 1927.

Appellant Sellers testified to the date of her arrival in Nebraska and meeting appellee; denied that she ever made any arrangement with Mr. Atwater of any kind, except that he did complain about his loss of time in nursing, and she stated he would be amply paid for it; denied that she had talked to Mrs. Atwater about paying the mortgage of $4,800 on the Atwater home as being part of the agreement had with Mr. Atwater in the presence of Mrs. Atwater; denied she ever saw the first will wherein her uncle had left his property to the Methodist Hospital in Omaha; testified to the payment to Mr. Atwater of the amount set forth in the claim above and also to the employment of attorneys; that Mr. Whalen drew the will in question, and at the suggestion of one Ed Livingstone she employed Mr. Crow, and that Charlie Byers had suggested the employ ment of Mr. Bruckman and that Hoagland & Carr were employed by her brother and sister, the other appellants.

William Whalen testified for appellants that he was one of the attorneys in the proceedings for the probate of the will, told about the conferences with the other attorneys, and was interrogated as to certain letters and papers and correspondence between appellants and Dr. Uridil and Mr. Atwater being burned or destroyed—he was not sure that they were destroyed; that on the same day, after the case was settled in the district court, something was said about papers, and they were taken from the room; what the papers were witness did not know. The evidence developed that there were a couple of letters written by Mrs. Sellers to Mr. Atwater from the time she had left Nebraska after the probate of the will in the county court and before the contest in the district court, in which letters, as Mr. Atwater testified, she had told him how she was returning, and wherein she said that if he would stay with them he

would never be sorry and that they would make it right with him. Mrs. Sellers denied that she knew anything about any correspondence or letters that she had written Mr. Atwater that were destroyed, that she didn't have copies of the letters with her written by her to appellee.

Appellants contend that the verdict of the jury is clearly against the weight and reasonableness of the evidence.

Concerning the testimony of appellee that no definite thing was to be done by him and that he had talked to persons to build up sentiment in favor of appellants, it developed that these talks were made to an attending physician of William C. McCartney, who was acquainted with appellant Mrs. Sellers, and with two bankers who had lived in the same community with William C. McCartney for years, and with Mr. Vance, a state senator, who was well known in the community. The only way in which this appellee could be of material assistance to appellants in the establishment of their rights and the maintenance thereof under this will, which he witnessed, would be by his testimony as to the mental competency of William C. McCartney at the time the will was made.

We quote from appellee's brief the following language: "There is no complaint that he failed to do what was asked to be done; that he failed in attendance at the office of counsel for defense. How valuable his services might have been had an actual contest of the will developed, we do not know. His relation to the matter was peculiar. He had been the nurse of the testator for five weeks. He knew his physical and mental condition, perhaps, better than any one else. He, probably, could be more helpful than any one else in some of the issues that might arise in the contest." This is tantamount to saying that he was a valuable witness for appellants in asserting their rights and interests before the court in so far as the second and last will was concerned.

The agreement alleged by appellee in his petition was to the effect that he would assist appellants in the employment of proper counsel, in the preparation of the neces-

sary evidence for the maintenance of their rights in court, and in all respects advise and consult with them as to the assertion of their interests under said will, and that appellants, in the event of success in securing the property devised by said will, or the major part thereof, were to pay to appellee the sum of $5,000. The record does not disclose that he assisted appellants in the procuring of counsel. The interest he took in the contest was the interest of a witness, for which he was paid.

The agreement, as pleaded in the petition and upon which the lower court instructed, and the agreement the record portrays are two separate and distinct agreements. The agreement established by the evidence was to the effect that no particular or definite thing was mentioned that appellee was to do, only that he was to use his influence to do what he could in establishing sentiment in favor of appellants in the community. To establish sentiment means to create a mental attitude or thought in favor of appellants in the community, to cause a decision of mind formed by deliberation and reasoning of the people of the community in behalf of these appellants, to create opinion in support of appellants. The agreement, as testified to by appellee, is an agreement that would indicate that sentiment and influence would be an essential thing in assisting appellants to assert their rights and support them in the will contest.

A contract that has for its purpose the creating of sentiment and influence in the assertion and maintenance of appellants' rights is equivalent to saying that that influence and sentiment are the controlling factors in the courts of this state to establish the rights of appellants therein. Such an agreement, by its very nature, would be contrary to public policy and could not be enforced in the courts of this state. Courts of justice will never recognize or uphold any transaction which in its object, operation or tendency is calculated to be prejudicial to the public welfare; that sound morality and civic honesty are the cornerstones of the social edifice is a truism which needs no reenforcement by argument. The question whether a contract is against

public policy must be determined by its purpose and tendency. "It follows, to state the rule comprehensively, that all agreements relating to proceedings in the courts, civil or criminal, which may involve anything inconsistent with the full and impartial course of justice therein, are void, though not open to the charge of actual corruption." *Brown v. First Nat. Bank of Columbus*, 137 Ind. 655. "The law guards with jealousy every avenue to its courts of justice, and strikes down everything in the shape of a contract which may afford a temptation to interfere with its due administration." Note, 13 Am. St. Rep. 297. In *Thomas v. Caulkett*, 57 Mich. 392, the principle set forth therein applies in this case that the good faith of the parties to the contract is not the test of its validity; the contract must be measured by its tendency and not merely by what was done to carry it out. Whatever tends to injustice or restraint of a legal right or to the obstruction of justice, or to the obstruction or perversion of the administration of the law, whenever embodied in or made the subject of a contract, the contract is against public policy and therefore void and not susceptible of enforcement. *Davies v. Davies*, 36 Law Rep. Ch. Div. (Eng.) 364; *State v. First Bank of Nickerson*, 114 Neb. 423.

A restatement of the language used in appellee's brief as to how valuable appellee might have been had the contest on the will not been settled and the peculiar position appellee was in and the knowledge he had would indicate that he was in the position of a witness who might well be in the camp of appellants and his value to appellants would be by his testimony. If this be true, the contract would be against public policy. Such a contract would have a tendency and offer a strong temptation to the procurement of perjury; the tendency of such an arrangement would be to pervert justice, to bring the courts into disrepute and cause a lack of confidence therein. Witnesses, like jurors and court officers, owe a duty to the state to aid in the due administration of government for such compensation as the law provides. The least tendency to the

contrary should not be tolerated, however innocent the claimed intent. *State v. First Bank of Nickerson, supra.*

In view of our holdings, it is not necessary to discuss the other assignments of error raised by appellants.

We must therefore conclude that the verdict of the jury is clearly against the weight and reasonableness of the evidence, and that the contract sought to be enforced is against public policy. The judgment of the lower court is therefore reversed and the action dismissed.

REVERSED AND DISMISSED.