NETTIE CUVA, APPELLEE, V. GLENS FALLS INSURANCE COMPANY, APPELLANT.

285 N. W. 917

FILED MAY 26, 1939. No. 30563.

*Gross & Crawford,* for appellant.

*O'Sullivan & Southard, contra.*

Heard before SIMMONS, C. J., EBERLY, PAINE, CARTER and MESSMORE, JJ., and KROGER, District Judge.

MESSMORE, J.

This is an action brought in the district court for Douglas county to recover on two fire insurance policies, one on household and personal effects for $1,000, and the other on a dwelling-house for $2,000. The cause of action for damage to the dwelling, which stood in the name of plaintiff's husband, was assigned by him to the plaintiff, in order that the entire matter could be litigated in one case.

Plaintiff sought to recover $637.98 as damages for household furniture and clothing, and $1,216.80 for damage to the house. Defendant admitted the issuance of the two policies and the fact that a fire had occurred, and that some damage resulted therefrom; denied that the damage was of the nature and extent as alleged by plaintiff, and alleged that the fire had been occasioned by the act of procurement by the insured, and that, as a matter of public policy, there could be no recovery therefor. As to the cause of action for the household and personal effects, defendant alleged that, even if the fire had not been incendiary, there could be no recovery because plaintiff had submitted false proofs of loss, claiming destruction of items not contained in the premises at the time of the fire, which would be violative of the provision that the entire policy should be void in case of any fraud or false swearing by the insured, touching any matter relating to the insurance or subject thereto, whether before or after the loss. The jury by a five-sixths verdict found for the plaintiff, allowing $955.65 for damage to the building, and $244.35 for damage to the contents. Defendant appeals.

The evidence discloses the following: Joseph Cuva, 44 years of age, his wife Nettie, and six children, two girls and four boys, ranging in age from 3 to 15 years, lived at 1760 South Ninth street in Omaha, in a modern, 5-room,

frame dwelling, with basement, all rooms situated on one floor. It was purchased in 1926 for $2,600. March 13, 1936, at 6:30 or 7 o'clock in the evening, the entire Cuva family went in an automobile to the home of Joe Italia, a cousin of Joseph Cuva, where they were giving a children's party. Cuva stayed at his cousin's home for about an hour and a half, leaving to return to his own home, where he wrapped a lunch, which had been prepared by his wife, and took a nap for an hour or two. Leaving the house about 9:45, he proceeded to the home of his uncle, Conceto Prestito, who worked part-time at the smelting works subject to call. Prestito's home was about a block from the Cuva home. Plaintiff called her husband by telephone at his uncle's home about 10 o'clock p. m., informing him that the younger child had eaten some ice cream and cake and had become sick, and that the family were staying at the Italia's that night. The Italia home is a 5-room house, with four beds in the house, and the Italias have three children, so, in all, 13 persons were staying in the Italia home that evening. Joe Italia was to bring the Cuva family home, but, due to the child's sickness, Mrs. Cuva requested her husband by telephone to call for the family the next morning. Cuva left his uncle's home about 10:30 p. m., going to the American Smelting & Refining Works plant where he was employed as an electric-crane operator, checking in for work at about 11 p. m. He worked until the next morning at 7 o'clock when he drove directly to his home. He did not enter the house, stating it was too dangerous, as the floor was all burned away. He met one Ormsby, an insurance adjuster, whom he later employed. He went for his wife and children about 9 or 9:30 o'clock and took them to her mother's home.

The fire was of incendiary origin, and this fact is not questioned. The evidence further discloses that there was found in the dining-room a barrel, with about a 40-gallon capacity, half-filled with gasoline; that the level was even with the top of the dining-room table, and that streamers, made of paper and saturated with turpentine and naptha

gasoline, had been placed in such a position that they led into the barrel containing the gasoline; that the barrel was set inside of a galvanized tub; that the barrel was leaky, and the inflammable fluid was apparent on the floor. There is evidence that the Cuvas had a barrel in their yard which they testified was of 15-gallon capacity. Some witnesses fixed the capacity of the barrel, half-filled with gasoline, at 25 to 40 gallons. There is evidence that the ignition of the tapers was caused by some instrument of delayed ignition that had been used and set upon the streamers, and a gas connection, with a number of ends removed, was apparent. The doors and windows were locked, and the locks were presumed to be ordinary locks which a skeleton key would open. There is some evidence of a special lock on the back door. The only ones possessing keys to the house were Joseph and Nettie Cuva. The alarm was received at 1:37 in the morning. The first fire apparatus arrived a minute or so later. The windows and doors were knocked in and water was applied to the flames. The firemen discovered the barrel, half-filled with gasoline, the paper streamers leading to the barrel, and that a trap door leading to the basement from the upper part of the house had been nailed down; that there were no embers in the furnace; that it was cold. Cuva stated that when he left the house he banked the furnace fire.

The origin of the fire was in the dining-room. It had burned out through the ceiling and communicated to the loft in the south bedroom, dropped down between the joists and burned into the basement, and a large hole was burned in the dining-room adjacent to the kitchen. The kitchen was only affected by heat. There was no fire in the southwest bedroom, only heat and smoke. The living-room was scorched, and surface burns appeared on some of the furniture. The wallpaper was scorched, and the south bedroom pretty well scorched.

The evidence further discloses that Joseph Cuva came to this country in 1912, was admitted to citizenship in 1917, attended the Pacific school in Omaha, worked at

different jobs for a period of six or eight months, and has been steadily employed in the smelter since 1926. He has no debts except a doctor's bill and a hospital bill, both aggregating a trifle over $200. Certain repairs were made on the house which are detailed in the evidence. The house is clear of encumbrance, and the taxes are paid.

After the fire Cuva was questioned by the officers. He first stated that he received the telephone call from his wife while at the smelter where he worked; he later stated that he received this call at his uncle's home; that he usually took his uncle to work at the smelter in his car.

The policies of insurance provided for immediate notice in writing to be given the company of any loss, and a signed and sworn statement to be rendered to the company, setting forth the cash value of each item and the amount of the loss thereon. Mrs. Cuva, with the aid and assistance of her husband and children, furnished a list of all the wearing apparel of the family, the furniture, bedding, kitchen utensils, dishes, silverware and glassware that were in the house at the time the house and contents were fired. As a detailed description of the items would unnecessarily lengthen this opinion, some of the wearing apparel may be summarized as follows: Suits of underwear 34; shoes 16 pairs; hose 86 pairs; overalls 24 pairs; dresses 27; shirts 40. The testimony of the chief of the fire department, two fire captains, three firemen, and two members of the arson squad, two adjusters, an upholsterer and furniture dealer was, in effect, that the house contained no such number of items as set forth in the proof of loss submitted by the plaintiff; that not more than 15 items of clothing were found in the house. All of such clothing was contained in the drawers of a dresser in the dining room, in a chifforobe in one bedroom and on some hangers on a cross-pole in a bedroom. None of the articles was in any way touched by fire. The dresses on the cross-poles had been scorched but not burned. There were no pillow cases, sheets or other bedding, and the mattresses on one bed and a child's crib had been burned. A few dishes and a small amount of

silverware were found in the home. The proof of loss provided for two dozen plates, two dozen cups and saucers, two dozen glasses, and two dozen silver forks. There was a discussion about a radio being in the house at the time of the fire; defendant's witnesses stating that there was no radio in the house at the time. The only food found in the house was a part of a loaf of bread, a part of a bottle of catchup, and a small amount of flour in a canister. The explanation given for the scarcity of food was that Mrs. Cuva generally did her buying for the family on Saturday night, when she could obtain better bargains. The greater weight of the evidence clearly discloses that the number of articles found in the house at the time of the fire is, to a great degree, less than the amount as claimed in the proof of loss. Mrs. Cuva and Mr. Ormsby testified as to religious and other pictures hanging on the walls of the house and being seen, before and after the fire, by the parties. Defendant's witnesses testified that there were no such pictures as claimed by the plaintiff.

The following rule of law is applicable to the situation as disclosed by the record:

"A verdict so clearly wrong as to induce the belief on the part of the reviewing court that it must have been found through passion, prejudice, mistake, or some means not apparent in the record, will be set aside and a new trial awarded." *Garfield v. Hodges & Baldwin*, 90 Neb. 122, 132 N. W. 923. To the same effect is *Hoffman v. McKeen Motor Car Co.*, 95 Neb. 238, 145 N. W. 257.

"When it is clear that material testimony has been disregarded by the jury, and which if considered and given due weight, would require a different verdict from that returned, a new trial will be granted." *Dunbier v. Day*, 12 Neb. 596, 12 N. W. 109; *Exchange Bank v. Gifford*, 102 Neb. 324, 167 N. W. 69; *Peterson v. Omaha & C. B. Street R. Co.*, 131 Neb. 676, 269 N. W. 510; *Id.*, 134 Neb. 322, 278 N. W. 561. See, also, *Atwater v. Sellers*, 122 Neb. 118, 239 N. W. 629.

It is unnecessary to discuss other assignments of error,

in view of our holding. It follows that the judgment of the district court should be and is reversed and the cause remanded for a new trial.

REVERSED.