·Allen Getty, appellee, v. North River Insurance Company, appellant.

286 N. W. 271

Filed June 2, 1939. No. 30445.

*Wright, Wright & Kennedy* and *Stanton & Stanton,* for appellant.

*Fischer, Fischer & Fischer* and *W. T. Thompson, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

CARTER, J.

Plaintiff commenced this action to recover on two fire insurance policies issued by the defendant. From a verdict and judgment for $2,700 the defendant appeals.

The evidence discloses that on December 16, 1936, the defendant issued a fire insurance policy in the amount of $2,000 on a one and one-half story cement block veneer dwelling-house located in Stromsburg, Nebraska, which was totally destroyed by fire on January 2, 1937. On July 23, 1936, the defendant insured the household goods in the above described dwelling in the amount of $700.

The defendant admits the issuance of the policies, the payment of the premiums thereon, and total destruction of the property by fire. Defendant alleges as a defense that plaintiff and defendant's agent, John H. Getty, the son of plaintiff, conspired to fraudulently overvalue the house at the time the policy was issued; and that, when the fire started, plaintiff and his son intentionally delayed giving the fire alarm for an unreasonable period of time, which

resulted in a complete loss of the dwelling and its contents.

It is the contention of the plaintiff that the valued policy law, Comp. St. 1929, sec. 44-344, is a bar to the pleading and proving as a defense that fraud was perpetrated on the insurance company by intentionally overvaluing the dwelling. In support of this contention plaintiff cites the cases of *Lancashire Ins. Co. v. Bush,* 60 Neb. 116, 82 N. W. 313; *Fadanelli v. National Security Fire Ins. Co.,* 113 Neb. 830, 205 N. W. 642; *United States Fire Ins. Co. v. Sullivan,* 25 Fed. (2d) 40. We do not feel any necessity to discuss this point, or the cases cited in support thereof, in view of the issues submitted to the jury and their findings thereon.

The evidence of the defendant shows that plaintiff purchased the dwelling-house in question about fourteen months before it burned for the sum of $500. There is evidence also that plaintiff made certain repairs and improvements of the approximate value of $150. Plaintiff testifies that the value of the dwelling was $3,000. An agent of another insurance company which had insured the dwelling against fire in the amount of $2,000 testified that he inspected the house and in his opinion it was worth $2,500 to $3,000. This evidence presented a question of fact for the jury, and we find no reason for interfering with their conclusion on this question.

There is evidence on the part of Audrey Jurgens, the housekeeper, that John H. Getty discovered the fire and delayed turning in the fire alarm by driving slowly toward the main part of town. John H. Getty testifies that he tried to turn in an alarm by telephone and found the telephone out of order. He testifies that he drove toward town as fast as weather conditions would permit, but due to wind, snow and poor condition of the road he was unable to drive as fast as usual. There is also evidence in the record on the part of the housekeeper, indicating that John H. Getty was guilty of setting fire to the house. This evidence is disputed by John H. Getty. The verdict of the jury conclusively disposes of these questions of fact.

The defendant complains of the refusal of the trial court

to instruct the jury that the value of plaintiff's dwelling-house was to be determined by its value upon the open market and not by the cost of replacement. The trial court properly refused this instruction. If the plaintiff was entitled to recover, the only verdict that could be properly returned is one for the face amount of the policy as provided by the valued policy law. Comp. St. 1929, sec. 44-344.

All questions of fact having been resolved against the defendant by the jury, and there being sufficient evidence to sustain the verdict, the defendant's contention as to the facts is concluded thereby. We have examined all questions of law raised by defendant, and conclude that the record is free from prejudicial error. An attorneys' fee of $100 is allowed plaintiff as costs for the services of his attorneys in this court.

AFFIRMED.

PAINE, J., dissenting.

I find myself absolutely unable to agree with the opinion adopted by the majority of the members of the court in this case, and therefore respectfully dissent.

This case is difficult, for it was first argued to the court on November 22, 1938, and a reargument was ordered on March 21, 1939.

It appears to me that the verdict returned by the jury is not supported by the facts in the case, and I will briefly review the evidence.

Action was brought on two policies of fire insurance, viz., $2,000 upon a dwelling, and $700 upon the furniture therein. The jury returned a verdict for the full amount on each policy, and the court taxed attorney's fees of $200. Defendant appeals.

The defense, as set out in the answer, was that the plaintiff conspired with his son, who was the local agent of the defendant company at Stromsburg, Nebraska, to cheat, wrong, and defraud said company, and that said son represented to the company that said dwelling-house was of the value of $3,000, when the value of the same did not exceed $500, which sum the plaintiff had a short time before

paid for the real estate; that because of such false representations this defendant was deceived, and did believe the dwelling was of the value of $3,000, as represented; that had the defendant known the real value of the real estate it would not have issued the policy; that the defendant believed said false representations, relied upon them, and because of said fraud said policy never became a valid and binding obligation, and the defendant tenders into court the amount of the premium paid therefor.

It is further alleged in said answer that the plaintiff had knowledge of said fire and needlessly and purposely delayed giving notice or any alarm to the fire department of the city of Stromsburg for an unnecessary length of time, and until said fire had progressed to such an extent that said building could not be saved, thereby causing its total destruction, when a large part thereof could have been saved had prompt notice been given.

The plaintiff identified the policy of the defendant company, which was issued at Stromsburg, Nebraska, under date of December 16, 1936, by his son, J. H. Getty, as agent, and signed by his son. He also identified the policy for $700 upon the household effects.

The evidence discloses that no taxes had been paid upon this real estate since 1927, and that, of the $500 paid by Dr. Getty, the purchaser, over $300 was applied to delinquent taxes, and less than $200 paid to the estate which owned the property.

Upon cross-examination the plaintiff testified that he had purchased the property about a year and two months before it burned, and that it was about 22 years old. He testified that he asked his son to insure the property, as his son was agent for the defendant company; that they talked over the matter and inserted the value of the house at $3,000 in the application, as that was what they thought the building would be worth to build, and plaintiff testified that he asked for insurance in the amount of $2,000. Plaintiff testified that his son lived in the house, and they both ate there, but that he slept at his office; that after he

bought the place he repaired the roof in spots, doing some of the work himself, and put in electric lights, and had the house papered and painted. Plaintiff testified that at the time he purchased the house he understood it was being rented for $5 a month. He testified, when recalled to the stand, that on the morning of the fire he did not try to use the telephone from his office before going over to the telephone office to turn in the alarm.

. J. H. Getty testified that he was the son of the plaintiff, Allen Getty; that he was in the law and insurance business; that when he wrote the application for his father he placed the actual value upon the premises of $3,000; that it would cost more than that to replace the house. He sent in the report and application, and the company sent out the policy to be signed and delivered.

He testified that he got out of bed about 4 a. m. to put more wood in the heating-stove, and went back to bed and dozed off, and was awakened by the smell of smoke.

He testified that he first discovered the fire in the dining-room; that the telephone was in the dining-room, and he could not get to it to report the fire; that he closed the dining-room door as he saw the fire, but the smoke had thickened up awfully fast, and there was a lot of crackling in the dining-room, that it was a stormy morning, lots of snow and quite a lot of wind; that he honked his horn all the way down-town; that he grabbed the telephone in his father's office, but the telephone would not work; that he did not think of stopping at the telephone office to report it on the way down.

He testified that his father dressed, and then backed his car out of the garage adjoining his office, and drove around to the telephone office; that he drove around also, but brought the housekeeper and her little boy back to his father's office to stay, and he and his father both drove out to the fire; that when he got there the fire chief was right in the flames, with the chemical hose, doing all he could; that the closest hydrant was two blocks away, and they did not use the water hose. He said he was driving

a Lincoln sedan, and did not waste any time getting downtown.

On cross-examination he said the defendant company does not ask the applicant to sign the application, so he signed it.

J. L. Johnson, who sold the property to the plaintiff, testified that it was rented for $5 a month at the time it was sold; that it was sold to settle his brother's estate; that at first he had carried $1,500 of insurance on the place, but the last time they had it insured it was cut down to $1,000 on the house and $75 on the barn.

Dr. Roy L. Minnick testified that he went to the fire about 5 a. m.; that when he arrived the basement was all on fire; that he could not see any fire upstairs in the house.

James Farris, the chief of the fire department, testified that the telephone central called him at 5:15 a. m.; that the fire alarm can be turned in at the central telephone office or at the fire station; that when he got out there, there were 10 or 12 people there; that in his opinion the fire started in the basement.

Charles Barber testified that he was engaged in the real estate business at Stromsburg for 20 years; that in his opinion the Getty property was worth $400 on January 2, 1937, which price included the land and the other buildings; that the house itself was probably worth $300; that if the house had been wired for electricity and a new cesspool constructed it would increase the value of the property about $100.

Exhibit No. 10 showed that it was ten blocks from the Getty house to the fire department, where alarm could be made, and that, by driving from the Getty house, over the route J. H. Getty took on the morning of the fire, to his father's office, and then his father driving back to the telephone office, it made a trip five and a half blocks farther to turn in the alarm than would have been necessary if Halsey had turned in the alarm at the telephone office on his way down to his father's office.

The defendant introduced in evidence the deposition of

the housekeeper who was living at the house the night it burned. A brief summary of her testimony on direct and cross-examination is as follows: She was 22 years of age, and had a son five years of age, who was with her at Stromsburg. She testified that she was employed by Allen Getty, the plaintiff, as housekeeper, and that the plaintiff got his meals at the house some of the time, and got supper there the night before the fire, but did not sleep there; that his son, J. H. Getty, whom she called Halsey, slept at the house nights. She had been in the employ of plaintiff for about three months before the fire. She described the small amount of odd pieces of furniture in each room. She testified that a week before the fire Halsey took out two chairs, and also the library table and radio; that in the basement there was a large amount of cordwood, and that they used wood in the cookstove.

She testified that the fire occurred on January 2, 1937; that Halsey was at the house for supper, then went uptown, and came home about 9 o'clock, and proceeded to get intoxicated on wine, of which he drank almost a quart; that it was the first time she had seen him intoxicated; that three or four days before the fire Halsey brought home about a pint of kerosene; that it was in a whisky bottle, and was not labeled kerosene, but that she picked it up and smelled of it a day or so later; that he had left it standing on the basement steps.

She testified that she heard Halsey get up about 20 minutes before the fire started, but she did not know where he went, and 10 or 15 minutes later he told her he smelled smoke; that she got up, and there was smoke coming through a hole in the floor, under the bed, from the basement; that she immediately took her little boy, who was sleeping with her, and her coat, and went out the kitchen door to the garage; that the smoke was coming up around and under the door to the basement; that Halsey made about three trips back into the house, and brought out four or five of her dresses to the car, a typewriter, and a couple of quilts, and that after the fire she noticed that the washing-

machine, which had been kept on the porch, was off of the porch. He then got in the car and they started for town. She testified that she could see the fire in both basement windows as they drove by, but saw no fire in the upstairs or in the dining-room; that he usually drove very fast, but that this night he drove at a slow rate of speed, in fact, the slowest she had ever seen him drive; that he drove to the office of his father, the plaintiff, and went in and left her and her boy out in the car; that she could look in the window, and that while he and his father were there talking the son tried to use the telephone; that after five or ten minutes the plaintiff backed his car out and drove down to the telephone office; that it was almost half an hour from the time she first knew of the fire until they got to the plaintiff's office. She said that the two chairs Halsey took out of the house about a week before had been taken down-town to get them glued or repaired, and that they had been brought back, and were out in the garage the morning of the fire, and that he said the radio was taken down to be repaired; that they did not honk the horn coming into town, but when they started from the plaintiff's office to the telephone office the horn was honked, and that as soon as they got to the telephone office the alarm was turned in. She testified that she stayed at the plaintiff's office, and around 8 o'clock Dr. Getty came back to his office and used the telephone, and that it worked all right, and that no one had worked on the telephone from the time she first got there until plaintiff used it.

In the case of *Cuva v. Glens Falls Ins. Co., ante*, p. 359, 285 N. W. 917, this court reversed a verdict and judgment on two fire insurance policies, and held:

" 'When it is clear that material testimony has been disregarded by the jury, and which if considered and given due weight, would require a different verdict from that returned, a new trial will be granted.' *Dunbier v. Day*, 12 Neb. 596, 12 N. W. 109.

" 'A verdict so clearly wrong as to induce the belief on the part of the reviewing court that it must have been

found through passion, prejudice, mistake, or some means not apparent in the record, will be set aside and a new trial awarded.' *Garfield v. Hodges & Baldwin,* 90 Neb. 122, 132 N. W. 923."

The plaintiff bases his action upon the valued policy law, section 44-344, Comp. St. 1929. Aside from the valued policy law, there are four other sections of our statutes which apply directly to the case at bar:

"It shall be unlawful for any insurance company or any agent to knowingly issue any fire insurance policy upon property within this state for an amount which, with any existing insurance, exceeds the *fair value* of the property or of the interest of the insured therein, or for a longer time than for five years, except as provided in section 11 of article X (44-911)." Comp. St. 1929, sec. 44-701.

"It shall be unlawful for any party having an insurable interest in property located in this state to knowingly procure any fire insurance policy upon his interest in such property, for an amount in excess of the fair value of his interest in the property, or for an amount which, with any existing insurance thereon, exceeds the fair value of his interest in the property." Comp. St. 1929, sec. 44-702. See, also, Comp. St. 1929, sec. 44-703.

"'Over-insurance' exists where a party having an insurable interest in property has insurance thereon against the same hazard or peril in *excess* of the *actual value of his interest therein.*" Comp. St. 1929, sec. 44-102.

"Intentional misrepresentation of the value of the property insured as would influence the insurer, and without which the policy would not have been issued, renders it void and it is immaterial whether the policy is a valued or open one." 14 R. C. L. 1050, sec. 227.

Chief Justice Marshall, in the case of *Armstrong v. Toler,* 11 Wheat. 258, 6 L. Ed. 468, laid down the rule in this language: "Questions upon illegal contracts have arisen very often, both in England and in this country; and no principle is better settled, than that no action can be maintained on a contract, the consideration of which is either wicked in itself, or prohibited by law."

"It is, therefore, ordinarily true that the principal is bound by knowledge of such facts as come to the agent in the course of the business. But where the company's agent violates his trust, and colludes with the applicant to cheat and defraud the principal, the applicant cannot avail himself, as against the insurer, of the agent's knowledge in reference to matters to which the cooperation for the fraudulent purpose relates. And it makes no difference whether the acts done in fraud of the principal are intended to promote merely the interest of the applicant or the common interest of the applicant and the agent, for in neither case are such fraudulently concerted acts binding upon the person intended to be defrauded, and the same rule applies whether the agent conspires with the assured to defraud the company by false statements, or whether the act of the applicant is merely permissive. It is sufficient that the latter assents that the agent may insert the false statements in the application, both knowing them to be false; nor can the assured, with knowledge of the extent of an agent's authority, obtain any benefit from a contract made in excess of his authority by collusion by such agent." 2 Joyce, Law of Insurance (2d ed.) 1235, sec. 504. See, also, *Morrissey v. Travelers Protective Ass'n*, 122 Neb. 329, 240 N. W. 307; *Muhlbach v. Illinois Bankers Life Ass'n*, 108 Neb. 146, 187 N. W. 787.

The "fair value" of property is the amount for which such property can be sold in the market, and is not the cost of replacing the building by construction of a new building of like size and type.

Actual cash value, within the meaning of that term in the standard form of fire insurance policy, is the market price of the insured property at the time of the fire, and where there is no established market price, the market price must be estimated at such amount as in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. *Butler v. Aetna Ins. Co.*, 64 N. Dak. 764, 256 N. W. 214.

In *Seal v. Farmers & Merchants Ins. Co.*, 59 Neb. 253,

80 N. W. 807, it is said: "The representations of the appli-
cant become the basis of insurance, and if they be false,
touching matters material to the risk, the contract ob-
tained through their influence cannot be enforced." See,
also, *Gould & Kennard v. Kendall & Smith,* 15 Neb. 549, 19
N. W. 483; *Chapman v. Meyers,* 84 Neb. 368, 121 N. W.
245; *Towle v. New York Life Ins. Co.,* 121 Neb. 175, 236
N. W. 439.

"It is held that a gross exaggeration of the value pre-
vents a recovery, and fraudulent overvaluation avoids. And,
if the owner of property insured knowingly exaggerates the
value of the property to an amount far beyond the cost
price and the market value, and the insurer relies upon
the statement of such excessive value in entering into the
contract, such valuation is a conclusive presumption of
fraud, sufficient to annul the contract." 1 Joyce, Law of
Insurance (2d ed.) 420, sec. 162.

The plaintiff stands on the proposition that the valued
policy law is a bar to the pleading and proving as a defense
that fraud was perpetrated on the company by intention-
ally overvaluing the property.

In *Orient Ins. Co. v. Daggs,* 172 U.S. 557, 19 S. Ct. 281,
Justice McKenna, in discussing the valued policy law, said:
"It makes no contract for the parties. In this it permits
absolute freedom. It leaves them to fix the valuation of the
property upon such prudence and inquiry as they choose.
It only ascribes estoppel after this is done,—estoppel, it must
be observed, to the acts of the parties, and only to their
acts in open and honest dealing. *Its presumptions cannot
be urged against fraud,* and it permits the subsequent depre-
ciation of the property to be shown. We see no risk to in-
surance companies in this statute. How can it come? Not
from fraud and not from change, because, as we have
seen, the presumptions of the statute do not obtain against
fraud or change in the valuation of the property."

The valued policy law of Washington was set up as a
defense when an over-insured dwelling-house burned, with
a $600 policy in force which the owner had promised to

cancel when he took out a $1,500 policy, but failed to keep his promise. The court reversed a judgment for plaintiff, and said: "We are of the opinion that this means only that the damages suffered by the insured, upon a total loss of the insured structure, shall be measured by the amount specified in the policy, when there is a valid enforceable insurance contract; and that it *does not prevent the company from setting up fraud and misrepresentation by the insured* as to the value of the structure, inducing the issuing of a policy in an excessive amount, for the purpose of avoiding the insurance contract. Of course, to successfully avoid a policy because of fraud so grounded would require a very clear case of misrepresentation and inducement." (Italics ours.) *Myles v. Northern Assurance Co.*, 113 Wash. 158, 193 Pac. 703. See, also, *Quisenberry v. National Fire Ins. Co.*, 132 Neb. 793, 273 N. W. 197.

It is my opinion that gross overvaluation, fraudulent misrepresentation, and concealment may be alleged as a ground for contesting the valuation notwithstanding an incontestable clause of a valued policy law. 1 Joyce, Law of Insurance (2d ed.) 436, sec. 163c; 1 Couch, Cyclopedia of Insurance Law, sec. 74c; 14 R. C. L. 1050, sec. 227; 8 Couch, Cyclopedia of Insurance Law, sec. 2151; *Muhlbach v. Illinois Bankers Life Ass'n*, 108 Neb. 146, 187 N. W. 787.

Defendant insists that the evidence clearly establishes the fact that there was an unreasonable and unwarranted delay in reporting the fact that the property was on fire, which delay was sufficient to give the fire such a start that it could not be put out by the fire department under any circumstances, and this misconduct on their part is sufficient to bar recovery on the policy in this case.

A case in point is *Phoenix Ins. Co. v. Mills*, 77 Ill. App. 546. We have the case of a locked storehouse being on fire, filled with groceries. It was about 11 p. m. A number of men, some with buckets of water, gathered about the place, but plaintiff refused to unlock the door, stating that his goods were insured and he wanted pay for them. A judgment for plaintiff was reversed, and it was said:

"While nonfeasance by the insured may be culpable negligence, preventing others from extinguishing a fire is actual malfeasance, and will prevent a recovery under a policy of insurance by the wrong-doer."

In the March term, 1849, the court of Massachusetts had before it the case of *Chandler v. Worcester Mutual Fire Ins. Co.*, 3 Cush. 328, in which the lower court had held that evidence of gross negligence and carelessness and gross misconduct of the plaintiff as the cause of the destruction of the building would not constitute a defense to the action, and rejected the evidence. Chief Justice Shaw, in granting a new trial, said that, if an assured sees burning coals roll down to the wooden floor and he does not brush them up, it would be nonfeasance. It would not prove an intent to burn the building, but it would show culpable recklessness and indifference to the rights of others. Also, suppose the flame would begin to kindle in a small spot which a cup of water would put out, and the assured has the cup of water at hand, but neglects to put it on, this is culpable negligence. Then follows this statement: "The doctrine of the civil law, that *crassa negligentia* was of itself proof of fraud, or equivalent to fraudulent purpose or design, was no doubt founded in the consideration, that, although such negligence consists in doing nothing, and is therefore a nonfeasance, yet the doing of nothing, when the slighest care or attention would prevent a great injury, manifests a willingness, differing little in character from a fraudulent and criminal purpose, to commit such injury."

It is my opinion that the verdict returned by the jury in this case is contrary to the evidence and to the law, and that this court announced the true guide in *Cuva v. Glens Falls Ins. Co.*, *supra*: " 'When it is clear that material testimony has been disregarded by the jury, and which if considered and given due weight, would require a different verdict from that returned, a new trial will be granted.' *Dunbier v. Day*, 12 Neb. 596, 12 N. W. 109; *Exchange Bank v. Gifford*, 102 Neb. 324, 167 N. W. 69; *Peterson v. Omaha & C. B. Street R. Co.*, 131 Neb. 676, 269 N. W. 510; *Id.*, 134

Neb. 322, 278 N. W. 561. See, also, *Atwater v. Sellers,* 122 Neb. 118, 239 N. W. 629."