LLOYD PUEPPKA ET AL., APPELLEES, V. THE IOWA MUTUAL INSURANCE COMPANY, A MUTUAL COMPANY, APPELLANT.

87 N. W. 2d 410

Filed January 17, 1958. No. 34111.

*Beatty, Clarke, Murphy & Morgan, Donald W. Peder-son,* and *Frank E. Piccolo, Jr.,* for appellant.

*Crosby, Crosby & Nielsen, Halligan & Mullikin,* and *Maupin, Dent, Kay & Satterfield,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Appellant, for a consideration, issued and delivered to Lloyd Pueppka and Cleo Pueppka a standard fire insurance policy protecting them, within the limits thereof, from loss caused by fire or lightning to a building owned by them and described in the policy. The building was thereafter destroyed by fire and Lloyd Pueppka and Cleo Pueppka seek to recover from appellant the amount of the policy. There is no issue concerning the parties described in this court as appellees and intervener other than Lloyd Pueppka and Cleo Pueppka and they will not be again mentioned herein. Lloyd Pueppka and Cleo Pueppka will be referred to as Pueppka and Cleo Pueppka, respectively, and collectively as appellees.

The cause of action of appellees as stated by them is as follows: They owned 5 acres of the southwest quarter of Section 10, Township 14 North, Range 30 West of the 6th P. M., in Lincoln County, on which was lo-

cated a two-story, quonset-type building. The appellant was an insurance company authorized to conduct insurance business in the State of Nebraska. It, for a consideration paid by appellees, issued and delivered to them in Nebraska a standard policy of fire insurance and thereby indemnified them from loss or damage caused by fire to the building in the amount of $25,000. The building was destroyed by fire of unknown origin August 8, 1952. Appellant was notified of the loss as the policy provided but it failed to pay the loss as required by the policy.

The amended answer of appellant to the extent relevant to this appeal contains the following: An admission of the cause of action alleged by appellees and allegations that the consideration paid by them for the policy of insurance had been returned to them by appellant and the policy had been canceled; that the policy of insurance contained a provision "Unless otherwise provided in writing added hereto this Company shall not be liable for loss accruing (a) while the hazard is increased by any means within the control or knowledge of the insured"; that appellees caused the building described in the policy to be burned and destroyed by fire on August 8, 1952; and that the burning and destruction of the building by either or both appellees voided the contract of insurance.

Appellees replied by a denial of new matter in the amended answer of appellant.

Appellant, at the termination of the evidence, by motion asked the court to direct the jury to return a verdict for it on the ground that the evidence was not sufficient to sustain a recovery by appellees. The motion was denied. The cause was submitted to the jury and its verdict was for appellees in the amount of the insurance contract. Appellant made a motion for judgment notwithstanding the verdict or, in the alternative, motion for a new trial. They were each overruled and judgment was rendered for appellees in accordance

with the verdict. This appeal contests the legality of the judgment.

Appellant contends that the trial court erred in denying its motion for a directed verdict at the conclusion of the evidence and in denying its motion for judgment notwithstanding the verdict because the proof is not sufficient to sustain a verdict for appellees.

The disputed questions of fact were resolved by the jury in favor of them and in considering and deciding this appeal the evidence and reasonable inferences therefrom must be considered most favorably to them. Boettcher v. Goethe, *ante* p. 363, 85 N. W. 2d 884; Long v. Whalen, 160 Neb. 813, 71 N. W. 2d 496. The credibility of the witnesses and the weight of the evidence were for the jury and its verdict may not be disturbed by this court unless it is clearly wrong as a matter of law. Sorter v. Citizens Fund Mutual Fire Ins. Co., 151 Neb. 686, 39 N. W. 2d 276; Conley v. Hays, 153 Neb. 733, 45 N. W. 2d 900.

The circumstances of this litigation are:

Appellees engaged in the construction of a building on the 5 acres of land owned by them as described above commencing in February 1952 and continuing to July 13, 1952. It was a two-story, quonset-type building to be used and operated as a private club and a dwelling for the owners. It was 40 feet wide from north to south, 160 feet long from east to west, and had a concrete foundation. The shell or outside was corrugated 26-guage galvanized steel supported by 16-guage, 6-inch-thick steel beams 4 feet apart, except each end of the building consisted of concrete blocks. The insulation was Celotex and there was a 6-inch air space between it and the outside steel covering. The inside wall was knotty pine placed over the insulation. There were several air ducts along the base of the building and there were nine roof vents equipped with rotary or revolving ventilators. There was a free passage of air from the outside into the 6-inch air space in the walls

to and through the roof vents and the ventilators. This arrangement provided ventilation and prevented condensation. The opening into each ventilator was fitted with a trap door and equipped so that it could be opened or closed from the first floor.

The kitchen was the northwest room on the first floor of the building. It was about 14 feet north and south and 40 feet east and west. There was a door on the west near the northwest corner of the kitchen, an opening in the south wall for passage to and from the dining room, and an opening to the east near the northeast corner of the kitchen for passage to the east through a corridor to the bar. The dining room was south of the kitchen and was the southwest room of the first floor. It was about 25 feet from north to south and about 40 feet from east to west. There was an opening in the east wall in the southeast corner into a corridor leading to the east and northeast into a large room in which there were located a powder room, a gentlemen's room, the bar, the office, the stairway to the second floor, booths for serving customers, and an area for dancing. The principal entrance to the building, known as the Spur Club, was the south door situated a short distance east of the southeast passageway from the dining room. There was an emergency door in the east end of the building which was confined to that use.

There were three bedrooms, a large living room, a kitchen, a bathroom, and closets on the second floor of the building which were occupied by appellees and their two children as their home. The entrance to the second story was a stairway from the first floor commencing a short distance east of the south door spoken of above.

The building was completely furnished and equipped for the uses intended except the gas furnaces for heating the building were not connected with gas, the fuel intended for their operation. The pipes through which gas was conducted to the appliances in the building were

temporary and were to be replaced by permanent installation of pipelines but that had not been done at the time of the fire important to this case. A ceiling had not been placed in the kitchen. It was open above to the beams and to the floor of the second story. These and some additional minor items were to be completed after the club was open for general use on July 13, 1952.

There were installed in the kitchen on the first floor, commencing at the northwest corner and proceeding east along the north wall, a deep freezer, a laminated top table with iron pipe legs sometimes referred to as a cutting table, a multiple-burner, commercial-type range or cooking stove with a grill about 25 inches wide, 2 electric deep-well fryers, an electric ice cube maker, and a double urn coffee maker operated with gas. Immediately south of the range a few feet was a table similar to the one spoken of above for general use in preparing and serving food. In the southwest corner south of the west entrance to the kitchen was a walk-in refrigerator equipped with a compressor and electric motor to operate the freezing process. The compressor and motor were outside to the east of the refrigerator and the motor was not sealed but was exposed. East of the refrigerator and west of the opening from the kitchen into the dining room was an automatic gas water heater equipped with a pilot light. East of the entrance from the kitchen to the dining room and extending to the east wall of the kitchen were a sink and a work table.

The propane gas system as it was installed consisted of two 1,000-gallon propane tanks set, according to regulations, about 60 feet west of the northwest corner of the building and connected by a manifold system so if the gas in one of the tanks was exhausted the other would automatically feed gas into the system. There was attached to each of the tanks a 15-pound regulator. There was a copper tube or pipeline from the tanks to the northwest corner of the building to a regulator with which it was connected. This regulator reduced the

pressure of the gas in the line to 6 ounces. The copper line extended from the regulator to ground level and to the east along the building to a T to which it was connected. A copper tube attached to one part of the T went to and through a hole in the north wall of the building some distance above the ground level and to a T on the southwest part or corner of the stove or commercial range about 35 inches above the first floor of the building. There was a T at that location and the copper tube was attached to it by being inserted into a fitting spoken of in the record as a brass reducer bushing, a brass L adapter, a connector, or flare nut. It will be referred to hereafter as a connector. The end of the pipe was flared or enlarged and the connector was screwed onto a part of the T which projected from the center of it toward the north. One end of the T was fastened securely by being screwed onto the feed pipe of the stove and the other or west end was fitted with a nipple and a brass elbow was fastened to the west end of the nipple. A copper gas line was connected to the brass elbow at this location by a connector and the line went north to the wall, up the north wall to the top of the kitchen, south to the south wall, and down to the water heater where this line was attached to the heater and furnished the gas to operate the pilot light and the heater. There was a copper tube attached to the east end of the T outside the building north of the location of the stove and it extended east and south through the north wall and was attached to the coffee urn. It furnished gas to operate the coffee urn.

The installation as above was completed the first night the club was opened. The last connection of the line was made to the water heater then because it did not arrive until the day of the opening of the club. Tests of the installation were made and the result indicated the construction was proper and satisfactory for the use intended except it was discovered that there was a defective valve on the coffee urn. It was immediately

removed and the defect was corrected. The gas line outside the building was tested by a pressure meter or gauge installed on the 15-pound side of the regulator so it would make about 20 pounds of pressure. The tanks were shut off, a reading of the gas was taken, and it was left in that situation for a couple of hours. When it was read again it had not dropped an ounce of pressure. This established the gas line was tight and available for use. The fittings and connections of the lines in the building were tested by the use of a liquid leak detector, a chemical product made especially for testing leaks of propane gas. It would bubble and foam up if there was a leak of gas so minor that it could not be ignited. The gas line proved by these tests to be free of leaks and proper for service of gas to and in the building. The person who made the installation was at the club on several occasions afterwards. There was no complaint made to him concerning it. He did at one time make an adjustment as to the flame on the stove to secure a hotter fire on a couple of the burners.

The gas line described above was in use as a facility in the operation of the club from the time the line was completed the first night the club was opened. Many people visited it. There were as many as 300 people in attendance at what is referred to in the record as the grand opening the night of July 13, 1952. The total membership of the club was stated as 565. The club was operated and patronized nightly after the opening except on one night of each week it was closed. There were employees in the kitchen near, around, and using the appliances when the club was opened from 6 p. m until 2 a. m., as well as during the preparation for the nightly activities and the cleaning-up work after it was closed for the night.

Appellees and their children lived there. It was their home. Appellees cleaned the entire first floor of the building on the day of the fire. Cleo Pueppka was there until about 2:30 p. m. of that day and Lloyd Pueppka

was there until somewhat later that afternoon. He was in the building and went through it when he left it in company with his brother-in-law. The brother-in-law entered through the kitchen and was in other parts of the building. There were other persons in the building that day. The propane gas used in it was odorized by a product which caused it to give off an easily detected, offensive odor if it was released or escaped. The gas was odorized for the purpose of alerting persons if gas had escaped. There was no one who appeared and claimed that they knew or even suspected that gas was escaping or leaking from the gas system of the building. On the contrary, all who spoke on the subject, including appellees, denied that they had experienced anything which caused them to think that any gas was leaking in or about the building. Likewise, the witnesses who were in a situation to know said the equipment of the building on the day of the fire was in proper condition and operating normally. There was no one who was there August 8, 1952, who made any claim of seeing or smelling smoke or of having any experience to alert them to a belief or suspicion of a fire or any unusual condition in the building until shortly before 4 o'clock that afternoon when persons from various locations detected positive evidence of a fire in the building.

Appellees and their children were at the club the night of August 7, 1952, and the morning of Friday, August 8, 1952. Breakfast for the family on that morning was prepared in the first floor kitchen of the club. The stove there was then used for cooking by Cleo Pueppka. They ate in the dining room of the club. It was a late breakfast. A painter had arrived and was painting on the south side of the building before appellees were up. The workman was there to paint the dormer windows on the south and north sides of the building. A representative of a plumbing and heating firm came to the club while appellees were at their morning meal in reference to an indebtedness they owed to

the firm. He was at and in the building for a considerable time. A man who had done some work on the building came there in the forenoon but he did not enter the building. He came back in the afternoon and he was in it.

The children of appellees at about 10 or 10:30 o'clock that forenoon went to the home of Mr. and Mrs. Johnson about a half-mile distant to visit and play with their children. The children of the two families were frequently together either at the Johnson home or at the home of appellees. Appellees had thoroughly gone over, cleaned, and put in order the entire building including waxing the floor in the dance hall after they had finished breakfast and before Cleo Pueppka left there that afternoon. She left the club about 2:30 that afternoon and went to the Johnson home to get her children and take them with her to North Platte. She visited for a time with Mrs. Johnson. The children desired to remain there rather than accompany their mother to the city. She left them and proceeded into North Platte primarily to secure a waitress to assist at the club. She made calls on different persons whom she thought might be secured and finally she was successful in securing the help she desired. While she was returning to her home she learned the building was burning. When she left the club that day the persons who were there were the painter, who was working on the north side of the building, and her husband. The building and everything in it when she departed to go to North Platte were, so far as she could tell, in normal and usual condition. There was nothing unusual except the smell of fresh paint on the second floor and floor wax that had been applied to the dance floor that day.

Pueppka, after his wife Cleo Pueppka drove away from the club in the family automobile as recited above, had his pick-up truck parked on the south side of the building. He then went to the living quarters on the second floor to clean up and dress in preparation for going to North

Platte. While he was doing this Raymond Branting, hereafter called Branting, the husband of a sister of Cleo Pueppka, came to the club, entered it through the west door, and proceeded to the second floor where Pueppka was. It was then a little after 3 o'clock in the afternoon. As Branting came to the club he saw a man on a ladder painting a dormer window. He met or saw no one in the building at that time except Pueppka. He finished dressing and getting ready to go out. The two of them sat and visited a few minutes and they then heard an announcement on the radio that it was 3:30 p. m. Branting said he had to go back to work and Pueppka said he wanted to go to the sale barn and buy some stock to butcher. They passed down the stairs to the first floor. Pueppka went to the west door, closed and locked it, and then went to the south door where Branting had gone. They opened it and went out on a concrete approach to the door. They met a representative of a transfer firm who had come to collect a freight bill from Pueppka. The three of them stood there in a group and Pueppka and the collector had a conversation. Pueppka and the collector went into the building to the office, got a check, it was made out, and Pueppka signed it and gave it to the collector. He asked permission to look the club over. It was granted and he did that. He found nothing that was wrong with the building at the time he was in it. He then proceeded out the south door to his automobile and drove away. The Pueppka pick-up truck and the automobile of Branting were standing side by side south of the club. Branting got in his automobile and drove away. Pueppka went to his pick-up truck, got in it, and was ready to leave but he did not then do so. The last Branting saw of Pueppka he was in his truck in the yard in front or south of the Spur Club.

The painter said he finished painting at the club that afternoon at 2:30. He looked at his watch and ascertained this fact. He had to dispose of the ladder and

put other things away and he said he finished that and left the club about and not later than 3:20 p. m.

Branting noticed nothing unusual while he was in the building. He said it was something like 3 or 4 minutes between the time the radio announcement was made that it was 3:30 p. m. and when he was in his automobile ready to drive away from the club.

The area on which the building was located bordered on the west side of Highway No. 83. Pueppka said he drove out on the highway, then south to Twelfth Street, then to Poplar, out to Eighth Street, and to the Western Livestock Sales Barn in North Platte. He did not say when he did this. More specifically, he did not attempt to say how soon after Branting drove away from the club that he, Pueppka, started the trip to North Platte or what he did during that interval. He did say that he was the last person to leave the building before the fire; that everything was all right when he left the building; that there was nothing out of order as far as he could tell in or concerning the building, the gas system, or any of the equipment in the building when he departed from it; and that the fire was not started accidentally or from natural causes. It was 3.3 miles from a point directly in front of the Spur Club on Highway No. 83 to the north city limits sign on the highway north of North Platte. The distance from that sign to the station of the fire department of that city was .9 of a mile, a total distance from the club to the fire station of 4.2 miles.

Pueppka said that when he arrived at the premises of the Western Livestock Sales Barn he went to the Western Toggery, talked to a man there for a short time, walked to the sales barn, went up the stairs, and sat by the Hoban brothers. The sale was then in progress. He could not say how long he was there.

A resident of North Platte was traveling on Highway No. 83 toward that city and passed the Spur Club about 3:35 the afternoon of August 8, 1952. He had a clock on

the instrument panel of his automobile and as he came around the corner approaching the club he looked at the clock and was thereby able to fix the time as 3:35. He saw three persons standing on the cement stoop outside the south door of the club. He told Pueppka that evening that he saw the three men at that time and place and that he thought Pueppka was one of them. Pueppka said he was not and that he wished the person he was talking to had stopped to see who the three men were.

A representative of the United States Checkbook Company was on a trip from Stapleton to North Platte the afternoon of August 8, 1952. He was traveling on Highway No. 83 and when he was about a mile north and east of the Spur Club driving toward the southwest he saw smoke coming out of the soil pipe and a ventilator above the roof on the west end of the club. The smoke at first was about the color of steam but as he came closer to the building it turned to dark smoke and he concluded that the building was on fire. He increased the speed of his car to 60 or 65 miles per hour until he reached the north corporate limits of North Platte. He continued to the station of the fire department of that city and reported the fire. The time the report was made was 3:57 of the afternoon of August 8, 1952. The report of the fire at the Spur Club was made to the assistant chief of the fire department of the city of North Platte. He immediately advised the firemen then on duty. One of them set off the fire alarm and when it was set off it made a record of the time. It was 3:57 p. m.

A traveler on Highway No. 83 approached the Spur Club between 3:30 and 4 o'clock the afternoon of the day of the fire. As he came over the hill from the south about 150 yards from the club he saw smoke coming out of a west ventilator. He went to the building, looked in the window, and saw about halfway across the building a blanket of white or gray smoke. He was

sure the fire had just started. He returned to his automobile parked on the highway and he then saw smoke coming out of ventilators 1, 2, and 3 as it progressed toward the east. The smoke turned from a gray color to black in about a minute.

A Mr. Richman had an area of land and a garden 2 or 3 blocks northwest of the Spur Club. He went past it at 3 o'clock the afternoon on which the fire occurred on his way to his garden where he was engaged for some time when his attention was directed to smoke coming out of the windows upon the west end of the Spur Club. He did not know the exact time of this but it was near 3:30 p. m. He ran to the building. There was no one there. The first flame he saw was on the north side near an opening into the kitchen area. A few minutes later flames broke out from the upper floor. The heat was extreme. The west door of the building was closed but the main entrance door on the south of the building was open and smoke was coming through the opening of the door. The smoke was dark gray at first but it got black as the fire progressed. The first persons who came after Richman got there were workmen from a house being constructed about three-quarters of a mile to the southeast of the club, and shortly thereafter the firemen arrived. They made no effort to put out the fire. It was so hot and intense that there was nothing that could be done about it.

A carpenter working on the construction of the house being built, as referred to above, said smoke was detected there about 3:45 p. m. and he noticed smoke coming over a hill that was between that location and the Spur Club. He went to the fire. A lot of smoke was coming from the ventilator on the west end of the building. Fire was mostly in the west end. The wind was in the northwest and he could not get close to the south side because of smoke and heat. The firemen came soon after the witness arrived and when they came the flames had reached a window on the north side so

that they were easily visible. The fire had then developed until there was nothing the firemen could do to extinguish it.

The assistant chief of the fire department and a member of it who was a truck driver for the department left immediately after receiving word of the fire with a fire truck and went to the scene of the conflagration. They arrived at the burning building about 4:10 p. m. and the roof of the building collapsed at 5 p. m. The conflagration terminated about 5:30 or 6 p. m. When they arrived at the fire it was principally in the northwest corner of the building. The heat was very intense and was rapidly extending to all other parts of the building. It had developed to the stage and was too hot for the firemen to do anything about it or to make an attempt to extinguish it. The north gas tank was singing and there was frost up to about a foot from the bottom all around the tank three-eighths to one-half inch thick. The gas was flowing at a rapid rate. The fireman shut off the flow of gas. The assistant chief and another man removed a Skelgas tank located near the north side of the building which served the upstairs apartment of the building.

While Pueppka was conversing with the Hoban brothers at the sale barn there was an announcement over the loud-speaker that there was a prairie fire in the north hills. Many of the persons present left immediately because of the information that it was a prairie fire and that their assistance might be required. On the way to his truck Mr. Huffman joined Pueppka and they drove out of North Platte and north on Highway No. 83 over the route Pueppka had used in coming to the sale barn. When they reached the summit of the hill south of the Spur Club dense smoke was crossing the road and Pueppka then thought it might be his building that was burning. He drove around to the west of the building and parked. It was then quite generally on fire. There were flames coming out of two or three of the

ventilators and there was nothing he or anyone could do to save the building. The premises where the building had been were by order of the chief of the fire department, at the request of a Deputy State Fire Marshal, placed under guard and they were guarded by Pueppka and Harry Schlientz until Tuesday, August 12, 1952.

The afternoon of August 9, 1952, two Deputy State Fire Marshals and the chief of the fire department of North Platte went to the site of the burned building. The debris and remains were very hot and it was impossible to make more than an external examination. They examined the two large propane gas tanks from which gas was furnished to service the first floor of the building. They followed and carefully inspected the fittings, connections, and copper pipe of the gas line from the tanks to where it entered the building to connect with the cook stove in the building; the gas line to the place on the north side of the building where it entered to connect with the coffee urn; and the regulators which constituted a part of the gas line and gas system of the building. These were all in good operating condition and had not been injured. There was no break, disconnection, or leak in any of them. They, also at the request of appellees, looked for and found a metal suitcase near but to the west of what had been the south door of the bulding in which appellees claimed they had placed $700 or $800 in money. The officials examined the contents which were badly burned but they found no evidence of the money except coins in the sum of $35. The value of the coins was destroyed by the heat to which they had been subjected.

The area where the building was located was not entered except by officials and nothing therein was disturbed until Monday, August 11, 1952, except as above stated. On that day an investigation was made by two Deputy Fire Marshals of the state, the chief of the fire department of the city of North Platte, and an investigator for the National Board of Fire Underwriters.

They were checking to find evidence of the cause of the fire. They found a T securely and firmly attached to the feed pipe of the stove in the building which had been used for cooking. The stove was at the place hereinbefore described near the northwest corner of the kitchen. The feed pipe of the stove was near the top of it and the opening in which the T was fitted was at the southwest corner of the stove as it was located in the kitchen. The west end of the T or the end of it which was opposite to the one attached to the stove was fitted with a nipple. Each end of the nipple was threaded. The west end of the nipple was entirely open. Whatever fitting had been attached to the nipple at that place had been removed. The diameter of the nipple was about five-eighths of an inch. In the hexagonal fitting in the center of the T, the opening which was to the north as the T was attached to the stove, was a brass connector which attached the copper pipe to the T when and as the gas line was installed and used in the building. When the gas system was installed and while it was used it conveyed gas from the tank to the T on the stove and through the opening in the end of it attached to the stove to the feed pipe of the stove and thence to its burners. The system also conveyed gas to and through the other or west end of the T and the nipple thereon into and through a brass elbow fitted to that end of the nipple and through the copper gas line to the pilot and burner of the water heater. The fitting on the west end of the nipple attached to the T when the gas system was installed and used in the building was a brass elbow to which was attached the copper gas line to the water heater. The brass elbow had been removed from the west end of the nipple and it was entirely opened when the investigators found it on Monday after the fire on the previous Friday. The investigators found a considerable portion of a copper pipe which extended from the north wall of the building to and was attached by the brass con-

nector to the T attached to the stove. This pipe was on the floor under where the connection had been, parallel with the west end of the stove, with its ferruled or flared end to the south. The balance of the copper tube which extended from the north wall to the T on the stove was found in several small burned and disintegrated pieces. The investigators found about one-half of the copper tube which was in the building and supplied gas to the water heater. It was the part nearest the heater and its connection with the heater was undestroyed by the fire. The nipple on the T which was attached to the stove, as described above, when it was found after the fire had in about the second or third thread from its end to the west a minute piece of brass about half the size of a pinhead loosely adhering or clinging to the threads of the nipple. It was not brazed with the nipple. The fragments of burned material that had been melted and were found on the floor of the Spur Club near the west end of the range were copper and not brass. They were probably portions of the pipe from the north wall of the building to the stove that brought gas into the building and a part of the pipe that conducted gas to the water heater. A careful search was made around the west end of the stove for anything in the debris that might have been brass but there was no brass of the proportion, size, or quantity that could have been an elbow the size of the one which was fitted into the nipple when the gas system was installed and that was there while the gas system was in use in the building. There was after the fire no brass elbow found or any fragments or molten brass that accounted for the absence of the brass elbow from the nipple.

W. H. Campen was presented by appellant as an expert. He qualified as a graduate chemist from the University of Nebraska in the year 1919 and as a testing engineer. He established the Omaha Testing Laboratories, has operated that business for 35 years, and is

a part owner of it. The activities of the organization include the testing of nearly all kinds of materials. The witness has specialized in the chemistry and physics of fires since 1933. He is the author of a treatise on physics and chemistry of fires resulting from a course he conducted during the 3 years of 1930 to 1933 for the firemen of the city of Omaha. The publication is now used by many fire departments of Nebraska. He has been consulted by many officers and others in regard to the origin of fires. Immediately before he appeared in this case he was engaged by the Great Western Railroad in reference to the cause of a large fire in an Omaha alfalfa storage building. He is a member of the American Chemical Society; the Society for Testing Materials; the American Society of Civil Engineers; and a member of the National Academy of Science, a national organization before a meeting of which he was to deliver a paper in Washington on Monday following his appearance in this case.

The T which was found after the fire attached to the stove was submitted to the witness and while it was in his possession he examined it and made laboratory tests to assist him in arriving at an opinion with reference to it and the cause of the fire. He had thereby found and expressed the opinion that the T and the threaded end of the nipple had been exposed to a fire and that there was no yellow brass elbow or anything of that nature attached to it at that time. He said he established by laboratory tests conducted, which he described in detail, that if a yellow brass elbow attached to a galvanized nipple is subjected to a temperature of 1,700 degrees Fahrenheit, the brass elbow will melt and most of it will run off the nipple but some of the brass will be brazed to the iron of which the nipple is made. Brazing is a process of attaching brass to iron. It is often used to repair small breaks in iron pipes. There was no brass brazed to the threaded exposed end of the nipple fitted to the T found attached to the stove

after the fire. He said if brass is brazed to iron the brass becomes a part of the total of the iron. They are fused together, they become one, and it would be as difficult to remove the brass as it would be to remove any other part of the iron to which the brass was fused. He then expressed the conclusion that during the fire important to this case the nipple fitted to the T had no yellow brass elbow attached to it.

The witness was present in court and heard the evidence produced until the time he was examined and this included substantially the case-in-chief of appellant. He had seen the exhibits and had examined the stove. He was asked if he had an opinion based thereon as to how the fire in the Spur Club on August 8, 1952, originated. He said he had and stated in his opinion the fire started by gas burning at the outlet of the nipple attached to the T which was fitted to the stove when the investigation was made after the fire. The conclusion was based principally on these considerations: The construction of the building, the rapidity of the fire, the amount of gas delivered by the low-pressure regulator on the site, the effect of heat on brass and iron, the pertinent testimony of the witnesses, and the general knowledge of the witness of the progress of fires after they get started. The witness had made a set-up in a laboratory identical to the gas system which supplied gas to the building which was burned and he made tests which he explained in detail. The conclusion he reached and expressed was that after the gas became ignited at the outlet of the nipple it would require only about 3 minutes to produce smoke and only 10 minutes for the flame to start things burning at a good rate in the kitchen; that it would take only 20 minutes thereafter until the fire would progress through the rest of the building and finally come out through the windows on the second story or a total of about 30 minutes to accomplish this; and that he agreed with the testimony he heard in the case that it was about

30 minutes from the time the fire started until flames were seen in the upstairs windows.

The witness stated that the frost on the outside of the gas tank when the fireman examined it at 4:10 p. m. was the natural result of gas escaping from the tank at a rapid velocity. He said that when propane gas is changed from liquid to gas it produces coldness as a result of such transformation. The presence and accumulation of frost invariably appears if there is a rapid flow of liquid gas. He said it would require 20 minutes from the time the gas was ignited at the nipple until frost would appear on the tank. The presence and amount of frost depend on the amount of propane used. That is the controlling factor. He concluded that if the tank was frosted at 4:10 p. m. it was inescapable that the propane started flowing from the tank not later than 20 minutes earlier or 3:50 p. m. If the elbow was on the nipple fitted to the T on the stove when the fire in the building started by any accidental cause, it could not possibly have melted the brass elbow and let the gas start escaping from the outlet of the nipple before the firemen got there at 4:10 p. m.

The witness said all standard liquid petroleum gas is mandatorily odorized so that leaks and escaping gas can be detected by the sense of smell. A compound is used in odorizing the gas which has a very strong smell like decayed eggs or garlic so that the presence of gas is easily and quickly detectible.

The witness determined the amount of gas that was delivered into the kitchen of the club through the outlet of the nipple and he considered that in arriving at his opinion above expressed. The regulator delivered 191 cubic feet of gas per hour. Propane gas has a BTU content of 2,500 per cubic foot. The total amount of BTU's delivered was 480,000 per hour.

Appellees produced Herbert R. Pearson as an expert witness. He said he was 49 years of age and a resident of North Platte for 18 years during which time his busi-

ness had been the handling and sale of propane gas and appliances. In connection therewith he had installed propane systems for heating and cooking in houses and for heat and other purposes in commercial buildings. He had read bulletins, periodicals, and things put out relative to the use of propane gas, its propensities, and what it will do. He had attended schools conducted by producers and suppliers of propane gas relative to the handling thereof, its propensity, and safety features. He said "about two such schools per year" are conducted by his suppliers and he pretty generally attended them. He had kept in constant touch with the installation and maintenance of propane gas systems. He said propane gas was a common name for liquified petroleum sometimes identified by the letters LP.

The witness was advised and became familiar with the location, size, and arrangement of the kitchen in the building concerned in this case. This was true in general as to its first floor. He knew the appliances, equipment, and facilities as they were located in the kitchen and he knew the kind and extent of the system which served the kitchen and its facilities with gas. He had examined and was advised of the contents of the exhibits in the case that were in any manner relevant to the inquiry as to the cause of the fire which destroyed the building. He had not heard any of the testimony in the case as it was produced at the trial. The witness was asked an extensive hypothetical question purporting to state the substance of the evidence as interpreted by appellees and he was asked if he had an opinion based thereon as to how the fire in the Spur Club on the afternoon of August 8, 1952, "could have occurred." He answered he had such an opinion and he was permitted to state his reasons therefor which he did in substance in this manner: He referred to the T which was fitted to the stove and the brass connector screwed into the center of the T and then said that there had been a terrific heat at that location because the brass con-

nector had molten brass in the lower part of its opening. He referred to the part of the copper pipe that extended from the north wall of the building to and was attached to the T by the brass connector when the pipe was installed, which after the fire was found near the west end of the stove on the floor wholly detached from the connector, and he said that he understood that the fragment or piece of pipe was connected to the T with the end of the pipe being placed into a connection and that "I also have noticed and assumed" that there is a flaw in this flare. The flare or flange to which reference was made was on the end of the copper pipe last referred to and described above which during the installation of the gas line was inserted in the opening of the connector and the end of the pipe was enlarged or flared outward so that the connector where it was screwed into the opening of the T held the pipe firmly and securely against the collar of the connector. The alleged flaw in the flare, after it had been through the fire and was in some manner undisclosed detached from the connector, is almost a V shape. The outer part of it is about three-eighths of an inch across and the depth to the point of the V is about one-eighth of an inch. The witness continued that the little V which is out of the flare would permit the gas to come back through the flare nut and "we would have a slow leak." The gas water heater had a flame when the burner on it was operating and there was a flame on the pilot of the water heater at all times. Propane gas is heavier than air. It does not rise but when in the open it falls to a lower level than the point of release. He said in his opinion gas seeped from this fitting "which could have been going on for hours—it could have accumulated in the vicinity of the gas heater, which would have ignited the gas, at which point you would have a flash of fire, which would have come back to the source of supply, which was at this point" (the place of the alleged defect in the flare). He said this would have

burned a hole in the copper tubing and if it burned a hole in the tubing there was a free flow of gas which would have caused the terrific fire. The amount of the gas that would have leaked through the V would have been increased if the connector was not screwed on so that the flare was tight against the collar of the connector. The flow of gas would be increased if it was loose. He said he had no knowledge that the fitting was not firm and tight and he did not claim to have any information that it was not. He stated that it required a temperature of around 1,700 degrees Fahrenheit to melt brass and about 2,000 degrees Fahrenheit to melt copper. He thought that if the gas leaked back through the brass connector it settled to the floor, spread out in the kitchen, and when it reached a flame it ignited all the gas that had spread out; that the fire then went back to the source of escaping gas and continued to burn; that the heat was enough to melt the brass connector; and that if the fire got started at that point and if the connector melted away, the intake pipe would naturally drop and there would be a free flow of gas.

A demonstration by the witness was made in the courtroom in the presence of the jury concerning which there is discussion and emphasis in the argument. However, it concerned only the hypothesis that propane gas when released will seek a plane lower than the point of escape; and that it will spread out and travel and if it comes in contact with a flame or fire it will ignite if there is a proper mixture of oxygen and gas, burn the accumulated gas, and the fire will return to the source of supply. This is a matter concerning which there is no dispute in the record.

The witness said there were two motors in the kitchen, one on the deep freeze and one on the walk-in refrigerator. They were exposed or unsealed motors. When either of them commenced to operate there was an arc or spark which would be sufficient to ignite propane gas.

The witness estimated it would require a minute or a minute and a half with a large crescent or open-end wrench to remove the connector and the elbow fitted to the outer end of the nipple if they were tight enough to require the use of a wrench, and that to have caused a fire because of the slow leak without an explosion would have required several hours.

The witness on cross-examination said that there was an opening in the north wall into the kitchen above the stove in which an exhaust fan was to be but had not been installed, which opening was 18 x 24 or 18 x 26 inches; that the ventilators on the building would create a certain amount of air movement from the west to the east in the building; and that any slow leak of gas would have a tendency to go towards the southeast. The possible slow leak that he spoke of would require considerable time, possibly at least 3 or 4 hours, in order to accumulate sufficient gas to be ignited by the water heater. His opinion was that the V-shaped place in the flare of the pipe was there from the inception of the gas system but he could not form an opinion as to whether it resulted from defective material or faulty workmanship. The gas installation that served the building was put in by a competitor of the witness in the same city. He knew no direct evidence as to the cause of the V-shaped place on the pipe. In order for that place to develop a slow leak, which the witness assumed, it would have been required that there had been some movement of or a blow to the pipe leading to the brass connector. There was no evidence of such occurrence. He spoke only of the possibilities of such an occurrence but not of evidence that it happened. Before the gas would be ignited it would have to build up over the entire floor to the height of the flame of the burner on the heater which was at least 8 inches above the floor and the witness could not tell how many cubic feet of gas from a slow leak of the size that he had assumed would be required to escape and spread over the floor

of the kitchen before it would reach the flame of the water heater. He specifically stated that his theory was that the gas leaked back through the threads of the brass connector, burned a hole in the copper pipe some distance from the connector, and after the pipe was burned in two then the flame from that place melted the brass connector. He contradicted or abandoned that theory later when he stated the burning gas from the slow leak caused by the V-shaped place on the flare of the pipe melted the brass which is now visible in the lower part of the opening in the connector or flare nut, as the witness referred to it in his testimony. It was melted, he said, by the flame caused by the leaking gas right at the flare nut so that in effect it burned itself off. He said he did not know how long it would take the slow leak to sever a copper pipe by burning it; that he did not know how much gas was escaping but he did know it would require 2,000 degrees of temperature to melt copper; and that he did not know how long it would require to melt brass under the circumstances he had assumed. When he was asked to specify what was meant by a slow leak he said that it was very hard to tell: A slow leak in a large area would be a fast leak in a small area, depending on the size of the room. He was asked how large a flame caused by the slow leak which melted the brass was at the connector according to his estimate and he answered: "It is awful hard to tell * * *; I don't know." Likewise, when inquiry was made as to how long it would take the flame to disintegrate the copper pipe, he gave a like answer and added: "The only thing I can say is that it is burned—the evidence is there." He agreed that the portion of the copper pipe and the brass connector he was talking about went through the general fire which destroyed the building and that the fragment of copper pipe which was then being discussed was part of a longer pipe which was severed by the fire and much of it was wholly disintegrated. The witness said that the

V-shaped place on the flare showed evidence of fusion or melting and that other parts of the same copper pipe which went through the fire and were badly burned showed a similar result and condition. He also said he knew of no evidence that the V-shaped place on the flare was there before the building was burned except his personal explanation of it, that all the information he had on that subject was his opinion, and that that was all he wanted to be understood as expressing.

W. H. Campen testified on rebuttal that the V-shaped piece of copper intake pipe referred to by the witness who appeared for appellees as an expert was not removed during its preparation and installation as a part of the gas system of the building because it showed definite evidence that it was burned off in the fire precisely the same as other holes and melted parts of the pipe of which the exhibit was a part before the fire. There is a hole burned in the pipe that was being discussed, close to the flare. The flame described by the expert for appellees at the connector caused by a slow leak of gas starting at the flared end of the pipe and going back toward the pipe through the threads of the nut would not melt the copper pipe or the brass connector because the flame assumed was small and the hot part of whatever flame the leak of gas created would have been above the copper pipe as that is the way a flame works, whether the escaping gas is around, on top of, or below the pipe. The molten copper pipe found in the Spur Club fire ruins in about the same location as the fragment of the copper pipe concerned in the above discussion shows similar V-shaped places resulting from fusion or melting caused by the burning building. The damage done to the pipe which was attached to the T on the stove resulted from the general fire which destroyed the Spur Club. The flared part of the pipe fits snugly against the collar of the brass connector. They are brought firmly together and they make a tight connection. With the end of the copper

pipe firmly against the collar of the connector there could have been only a very minute opening even though the V-shaped piece was missing before the fire. The opening in any event would not have been the size of the V-shape as it appears in the flare detached from the connector because the flange or flare on the pipe lays flat on the beveled edge of the brass fitting. Any opening which existed was the zero portion of the V. Any gas escaping in that situation would not create a flame more than 2 inches long above the copper pipe and would not have melted it. Likewise, a leak of that kind would never cause an explosion in the kitchen no matter how long it was there because the amount of gas would be so small compared with the size of the room and the amount of available air that there could not have been a condition that would have resulted in either a flame or an explosion. There could not have been escaping gas as has been assumed or it would have been detected by any person in the building and especially anyone near the place of escape.

A statement made by Pueppka exhibited by the record represents that he invested in the Spur Club property $32,000 in cash and he incurred indebtedness in acquiring the property of an additional $30,000 to $35,000 which has not been paid, or a total investment in the property of $62,000 to $67,000. Another statement placed in evidence by appellees sets forth that they had invested in the property $45,775.61 and that they had incurred in addition thereto unpaid indebtedness of $26,-464.82, or a total investment of $72,240.43. It should be mentioned that the last total stated includes an item of "Household goods & Mdse. 7,495.00" and an item "Estimated labor—Mr. & Mrs. Pueppka $10,000.00." The last item was the value of labor appellees say that they performed in the preparation of the site for and in the construction of the building.

Appellees had procured four policies of fire insurance on the Spur Club property. Two of them were dated

July 19, 1952, one is dated July 27, 1952, and the remaining one is dated July 28, 1952. The amount of the insurance represented by these policies is $65,000, consisting of $40,000 on the building and $25,000 on its contents.

The ledger statements of the bank exhibiting the deposit account of appellees show that the balance on deposit to their credit August 8, 1952, was nominal. There is no claim in the record that appellees owned any property except the Spur Club. They admittedly owed in excess of $25,000 of past due indebtedness which they could not satisfy. The success of the venture in which they were engaged before the fire was, to say the least, very doubtful.

It was testified by Pueppka that he did not at any time disconnect the brass elbow attached to the west end of the nipple which was fitted to the T attached to the stove or the copper pipe connected to the elbow on the north part of it; that he did not disconnect, sever, interfere with, or injure any part of the gas system which supplied gas to the building August 8, 1952, or at any time; that he had no knowledge or information of anyone who caused an incendiary fire in the building in which the Spur Club was operated August 8, 1952; that he did not ignite or cause a fire in the building or any part of the Spur Club which destroyed the property on that date; and that he had no knowledge or information of anyone else who tampered with, injured, disconnected, or interfered in any manner with any part of the gas system which supplied gas to the building.

A person passing the building at 3:35 the afternoon of the fire saw three men on the concrete approach to the south door of it, one of whom was Pueppka. The traveler on the highway near the building who saw a steam-like substance being emitted from the soil pipe and a ventilator which quickly changed to a dark smoke, traveled 4.2 miles by automobile at considerable speed from the Spur Club to the fire station and gave infor-

mation of a fire there at 3:57 p. m. It may be con-cluded that he passed the building about 3:45 p. m. be-cause the firemen left a minute after they got the alarm and traveled the same distance to the building in 12 minutes, arriving there at 4:10 p. m. Pueppka and Branting left the apartment on the second floor of the building and the former went by way of the large east room to and through the kitchen where he passed the stove. He closed and locked the west door, returned to the south door, and there joined Branting. They met the collector of a freight bill at the south door and the three of them were together just outside the south door a short time. Pueppka and the collector entered the building, the bill was paid, and the collector took a view of the inside of the club. The evidence is that 3 or 4 minutes after Pueppka and Branting were in-formed by a radio announcement that it was 3:30 p. m., Branting drove away from the building in his auto-mobile and he last saw Pueppka in his pick-up truck which was parked near to and south of the building. This was right at 3:35 p. m.

Mr. Richman saw dark gray smoke coming out of the west windows of the club some minutes before the fire-men arrived at 4:10 p. m. He ran to the building. There was no one there. He saw flames from the kitchen through the opening in the north wall above the stove. The smoke became black. He then observed flames come out of the upper windows on the north. The heat was intense and the fire was so hot that the firemen when they arrived could do nothing to extinguish it. It spread through the entire building. The roof fell in 50 minutes after the firemen got there and the con-flagration was complete by 5:30 or 6 p. m. A building in normal condition without incident at 3:35 p. m. was the victim of an internal fire by 3:45 p. m. and was condemned to complete destruction by a raging, ter-rific fire some few minutes before 4 p. m.

It was an incendiary fire. The last person in or near

the building, so far as the record shows, was Pueppka. He was there when Branting drove away in his automobile. The doors in the building were locked. Pueppka had just locked them. He had the keys and he had tools and the knowledge to accomplish the quick disconnection of the brass elbow from the nipple at the stove. The evidence of the time required to do this was a minute to a minute and a half. It was only about 10 minutes after Branting left the building that it was discovered on fire and it was only a short time after that Pueppka was at the sales barn when he heard the announcement of a fire which was in his building. If Pueppka had nothing to hide, it is difficult to understand why he admittedly and untruthfully denied the evening of that day that he was one of the three men near the south door of the building at 3:35 p. m. and why he said to the person who saw him there that he, Pueppka, wished that this person had stopped and secured the identity of the three persons who were standing near the south door of the building. The conceded misrepresentation to the chief of the fire department by Pueppka while the fire was in progress that he left the Spur Club at 3 p. m. that day must have been prompted by an attempt at concealment of the facts. These were not minor, remote, or incidental things. Only a brief time elapsed since their occurrence. A large loss had resulted and Pueppka had a large stake in the true facts. He must have known that a relentless and critical investigation and analysis of the facts would be made in an attempt to ascertain the cause of the fire because of the unusual attendant facts and circumstances and that carefulness and veracity of statement and true representation of the facts were the best probability of his recoupment.

. The investigation made after the site of the fire could be entered disclosed the absence of a brass elbow from the outer end of the nipple fitted to the west end of the T attached to the stove. The outlet end of the nipple

was open and permitted an unobstructed flow of propane gas under pressure into the kitchen where there was a flame not more than 10 feet from the point of escape. Careful examination and search disclosed no fusion of the brass attached to the nipple. There was no brazing of brass with the iron of the nipple and no molten brass was found in the ruins to account for the disconnection of the gas system and the absence of the brass elbow. It was established by a competent, experienced engineer, chemist, and specialist in the chemistry and physics of fires that the elbow was not on the nipple during the fire and that the outlet of the nipple during that time was open. He deduced from his knowledge of science and by tests that if the elbow was on the nipple at the inception of the fire caused by any accidental means it could not possibly have melted the brass elbow and permitted the gas to escape from the outlet of the nipple before the firemen arrived at 4:10 p. m. The gas tank was at that time frosted. This could only have been accomplished by gas flowing from it at a rapid rate and it would have required 20 minutes under the conditions existing to have caused the frost on the tank. With the elbow off the nipple there were BTU's delivered into the kitchen at the rate of 480,000 per hour or 8,000 per minute. This explains the rapidity, the intensity, and the immensity of the fire. The conclusion of the expert was that the sole cause of the fire was the fact that the outlet of the nipple was open. The reasons he gave for his opinion have been stated before and will not be repeated.

The witness called by appellees as an expert, Herbert R. Pearson, did not attack or contradict the validity or soundness of the reasons given for the conclusions of W. H. Campen, the expert produced by appellant. The expert for appellees, hereafter referred to as Pearson, followed the expediency of disregarding them. Pearson did not say that in his opinion the brass elbow was attached to the nipple at the time of the fire. He was

simply and totally silent on that subject. It was assumed in the hypothetical question propounded to him that the elbow was in place as it was installed at the commencement of and during the fire notwithstanding the positive, scientific evidence that it was not there during that time. Pearson did not, however, even hint that the elbow was in place during the fire. He or any other witness made no attempt to disprove or discredit the testimony of the expert produced by appellant in reference to fusion. Neither was there any effort made by appellees to establish that fusion of the elbow had actually taken place.

Pearson did not express an opinion as to what actually caused the fire but he did have and expressed a speculative opinion as to what could have caused it. The foundation for this was a hypothesis submitted which required him to assume that Pueppka left the Spur Club in his pick-up truck and proceeded to North Platte when Branting left the building in his automobile and that the brass elbow was at that time and during the fire attached to the nipple and performing its function. He was not asked to assume at any time that the evidence did not show that Pueppka left when Branting did or that the nipple showed no evidence of fusion or brazing of brass with it. Pearson thought that there might have been a slow leak of some gas back through the threads of the connector and into the kitchen because of a small V-shaped place on the edge of the flare of the copper pipe which had been attached to the center of the T by a brass connector and that the escaped gas might have become ignited, burned the connector or the pipe, and caused the pipe to become detached. He did not say that he found a defect in the flare. Specifically he said: "I also have noticed and assumed, that is, that there is a definite flaw in this flare." He did not disclose any factual evidence to that effect nor did he give his reasons for the assumption stated. He saw the exhibit which was the fragment of

the pipe on which there was a flare only after it had been in and had gone through the fire which destroyed the building, a fire which created a temperature of as much as 2,000 degrees Fahrenheit. There were other burned parts of copper pipe that were in the fire which have places on them similar to the V-shaped place on the flare referred to by the witness Pearson. W. H. Campen examined this place and found positive evidence of fusion. It was his conclusion that the small V-shaped place on the flare was caused by the fire which destroyed the building. The evidence supported his judgment and conclusion. The gas system was tested when it was put in and thereby it was demonstrated that it had no leak. It was completed July 13, 1952, and was used thereafter until the fire without indication or demonstration in any way or to anyone that there was a defect in or that there was escaping gas therefrom. The gas was odorized. There were many people in the building during that period, as many as 300 persons on a single night. Appellees testified that they knew of no defect in the building, its equipment, facilities, or gas system. No complaint had been made to the person who installed the gas system of any failure therein. Pearson assumed that there was a defect in the flare of the copper feed pipe of the gas system and on that basis he evolved and stated an opinion as to how the fire could have been caused in the building. His opinion was a speculation not supported but contradicted by substantially all of the facts and circumstances shown by the evidence in this case.

The essence of the challenge by appellees of the facts and circumstances of the fire as shown by the evidence is the specific and unqualified denial of Pueppka that he had any knowledge of the cause of the fire or that he in any manner contributed thereto and the opinion of Pearson as to how the fire could have originated. A statement from Davis v. Security Ins. Co., 139 Neb. 730, 298 N. W. 687, may appropriately be adopted in refer-

ence to his denial: "The circumstances are strong and convincing, when weighed against the mere denial of the plaintiff that he did not set the fire." The testimony of Pearson is not sufficient to create an issue of fact. The doctrine is that the value of the opinion of an expert witness is dependent on and is no stronger than the facts on which it is predicated. The opinion has no probative force unless the assumptions upon which it is based are shown to be true. Williams v. Watson Bros. Transp. Co., 145 Neb. 466, 16 N. W. 2d 199; Shamblen v. Great Lakes Pipe Line Co., 158 Neb. 752, 64 N. W. 2d 728; Anderson v Cowger, 158 Neb. 772, 65 N. W. 2d 51.

The record is convincing that the insured violated the specification of the policy of insurance that the company shall not be liable for loss accruing while the hazard is increased by or with the knowledge of the insured; that the defense of appellant in this respect is established as a matter of law; and that the verdict in this case is clearly wrong. A verdict so clearly wrong as to induce a belief by the reviewing court that it must have been found through passion, prejudice, mistake, or some means not apparent in the record, must be vacated. Trute v. Holden, 118 Neb. 449, 225 N. W. 238; Ellis v. Omaha Cold Storage Co., 122 Neb. 567, 240 N. W. 760; Cuva v. Glens Falls Ins. Co., 136 Neb. 359, 285 N. W. 917; Davis v. Security Ins. Co., *supra.*

If material evidence has been disregarded by the jury which if considered in a proper manner requires a different conclusion than the one made in the cause by the jury, its verdict and the judgment of the court thereon will be vacated in an appeal to this court. Cuva v. Glens Falls Ins. Co., *supra;* Davis v. Security Ins. Co., *supra;* Ward v. Aetna Life Ins. Co., 91 Neb. 52, 135 N. W. 220; Heink v. Lewis, 89 Neb. 705, 131 N. W. 1051. The trial court should direct and this court should set aside a verdict if the evidence is undisputed or if the evidence, though conflicting, is so conclusive that it is insufficient to justify a verdict or sustain a judgment.

Fairmont Creamery Co. v. Thompson, 139 Neb. 677, 298 N. W. 551.

The record shows that there have been three trials in the district court for Lincoln County, each of which involved the problem of the origin of the fire which destroyed the building concerned in this case. It may be assumed that no different or additional evidence can be produced now or in the future bearing on that issue.

The judgment should be and it is reversed and the cause is remanded with directions to the district court for Lincoln County to sustain the motion of appellant for judgment notwithstanding the verdict and to render a judgment of dismissal in this case.

REVERSED AND REMANDED WITH DIRECTIONS.